**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

JAMIE GREENE, LAMELL ARMOR,
FABIAN SAUGAR, JOHN BRENNAN, and
ARTHUR BENNETT, on behalf of themselves
and all others similarly situated,

                            Plaintiffs,                    **REPORT AND RECOMMENDATION**

            v.                                             **22-cv-3300 (JMA) (ST)**

METROPOLITAN TRANSPORTATION
AUTHORITY, LONG ISLAND RAILROAD,
METRO-NORTH RAILROAD, STATEN
ISLAND RAILWAY, MTA CONSTRUCTION
AND DEVELOPMENT, MTA REGIONAL
BUS OPERATIONS, MTA BRIDGES AND
TUNNELS, and NEW YORK CITY TRANSIT
AUTHORITY,

                            Defendants.
-----------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

Plaintiffs Jamie Greene, Lamell Armor, Fabian Saugar, John Brennan and Arthur Bennett,

on behalf of themselves and all others similarly situated ("Plaintiffs), brought an action against

Defendants Metropolitan Transportation Authority, Long Island Railroad, Metro-North Railroad,

Staten Island Railway, MTA Construction And Development, MTA Regional Bus Operations,

MTA Bridges And Tunnels, and New York City Transit Authority (collectively "Defendants" or

"MTA") alleging, among other things, delayed wage payments and overtime violations and related

damages under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

The Honorable Joan M. Azrack referred Defendants' Motion to the undersigned to issue a

Report and Recommendation.

For the below stated reasons, this Court respectfully recommends that Defendants' Motion

1

to Dismiss the Complaint in Part be granted.

## I.    BACKGROUND

### A.    *Overview*

Plaintiffs' First Amended Class and Collective Action Complaint ("Pl. First Am. Compl.") alleges that "[t]his lawsuit seeks to recover unpaid compensation and compensatory damages stemming from underpayments and late payments of wages" from the MTA to their employees. *See* Pl. First Am Compl. at ¶ 1, ECF 24.

The relevant events concern the MTA's use of "the third-party timekeeping and payroll service Kronos." *Id.* at ¶ 4.  Specifically, Plaintiffs allege that: "In December 2021, Kronos notified its customers, including MTA, that it had been the victim of a ransomware attack affecting all employers that use the service (the 'Kronos Outage')." *Id.*

Plaintiffs further allege that: "[d]uring the Kronos Outage, MTA continued to record its employees' time.  Despite this, MTA told employees that while it would continue to pay them some of their wages, it would not make other kinds of premium payments, including double time, shift differential, and meal allowances required by the collective bargaining agreements that apply to MTA employees." *Id.* at ¶ 5.

While the MTA allegedly "attempted to continue overtime payments for some employees, it did not design effective or workable processes to record overtime hours and payments owed, leading to failures to pay overtime in whole or in part." *Id.* at ¶ 6.

Plaintiffs assert that: "In early April 2022, four months after the Kronos Outage began, MTA began making back payments of unpaid compensation.  These payments have been incomplete.  To date, MTA employees have not received all overtime payments owed to them. And MTA failed to pay interest or any other form of compensation for the four-month delay in

pay." *Id.* at ¶ 7.

Based upon the above, Plaintiffs allege that: "MTA's failure to pay all overtime wages owed to its employees violates the FLSA and its interpreting regulations, which require that 'overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends.'" *Id.* at ¶ 8 (quoting 29 C.F.R. § 778.106). "New York Labor Law also requires timely payment of all wages due." *Id.* (citing N.Y. Lab. Law § 191).[1]

B. *The Parties*

1. Plaintiffs

"Jamie Greene has been employed by the Long Island Railroad since 2001, first as a machinist and then as a gang foreman. During the Kronos Outage, he was [allegedly] not paid all wages he was due for his work for MTA." *Id.* at ¶ 12. Plaintiffs further allege that: "Greene was also entitled to various supplemental wage payments, including meal allowances, under the terms of his union's collective bargaining agreement with MTA. Greene was not paid these supplements in the week after they were earned, nor in the week following; instead he was paid months afterward." *Id.* at ¶ 14.

"Lamell Armor has been employed by the Long Island Railroad since 2009, first as an electrician and then as a gang foreman. During the Kronos Outage, he was [allegedly] not paid all wages he was due for his work for MTA, including wages for overtime hours over 40 in a given workweek." *Id.* at ¶ 16. Plaintiffs further allege that: "Armor was entitled to various supplemental wage payments under the terms of his union's collective bargaining agreement with MTA. Armor was not paid these supplements in the week after they were earned, nor in the week following;

---

[1] Note, Plaintiffs' First Am. Compl. alleges that Defendants violated the FLSA (and applicable New York Law) "even before the Kronos Outage. . ." *See id.* at ¶ 9. The Court's forthcoming analysis adequately covers Plaintiffs' allegations both before and during the Kronos outage, though Plaintiffs' First Am. Compl. appears to primarily focus on the payments *after* the Kronos Outage.

instead he was paid months afterward." *Id.* at ¶ 18.

"Fabian Saugar has been employed by the Long Island Railroad since 1999, first as a machinist and then as a gang foreman.  During the Kronos Outage, he was [allegedly] not paid all wages he was due for his work for MTA, including wages for overtime hours over 40 in a given workweek." *Id.* at ¶ 21.  Plaintiffs further allege that: "Saugar was entitled to various supplemental wage payments under the terms of his union's collective bargaining agreement with MTA.  Saugar was not paid these supplements in the week after they were earned, nor in the week following; instead he was paid months afterward." *Id.* at ¶ 23.

John Brennan "has been employed by Metro-North Railroad as a machinist since 2006.  During the Kronos Outage, he was not paid all wages he was due for his work for MTA including wages for overtime hours over 40 in a given workweek." *Id.* at ¶¶ 26-27.  Plaintiffs further allege that: "Brennan was entitled to various supplemental wage payments under the terms of his union's collective bargaining agreement with MTA.  Brennan was not paid these supplements in the week after they were earned, nor in the week following; instead he was paid months afterward." *Id.* at ¶ 29.

Arthur Bennett "is employed by the Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"), a division of Defendant New York City Transit Authority, in MaBSTOA's Occupational Health Services Division, as a laboratory technician.  During the Kronos Outage, he was not paid all wages he was due for his work for MTA including wages for overtime hours over 40 in a given workweek." *Id.* at ¶¶ 31-32.

2. Defendants

"MTA is the largest public transportation agency in the country and employs more than 60,000 people in New York and Connecticut." *Id.* at ¶ 35.  Defendant MTA is: "a public benefit

4

corporation chartered by the New York State Legislature under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law § 1260 *et seq*." *Id.* at ¶ 36. Moreover, MTA "carries out its operations through its subsidiaries, Defendants Long Island Railroad, Metro-North Railroad, Staten Island Railway, MTA Construction and Development, MTA Regional Bus Operations, MTA Bridges and Tunnels, and New York City Transit Authority." *Id.* at ¶ 37. Plaintiffs describe each subsidiary as follows. *See id.* at ¶ 37a-g:

    a. Long Island Railroad operates a commuter rail system running from Manhattan to the eastern tip of Suffolk County on Long Island, New York. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    b. Metro-North Railroad operates a commuter rail system running between Manhattan and northern New York City suburbs in New York and Connecticut. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    c. Staten Island Railway operates a rapid transit line in Staten Island, New York. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    d. MTA Construction and Development is responsible for managing construction and development of major transportation capital projects in the New York City metropolitan area. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    e. MTA Regional Bus Operations operates surface transit in New York City. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    f. MTA Bridges and Tunnels operates toll bridges and tunnels in the New York City metropolitan area. It is a wholly-owned subsidiary of Metropolitan Transportation Authority.

    g. New York City Transit Authority operates public transportation, including subways and bus services, within New York City. It contains subsidiary agency Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"), which operates buses in upper Manhattan and the Bronx. New York City Transit Authority is a wholly-owned subsidiary of Metropolitan Transportation Authority.

Finally, Plaintiffs allege that: "All MTA Defendants are covered employers within the meaning of the FLSA and NYLL." *Id.* at ¶ 39.

C.  *List of Plaintiffs' Allegations*

Plaintiffs allege the following four causes of action: Pl. First Am Compl. at ¶¶ 91-102 (First Cause of Action: Fair Labor Standards Act: Late Payment- Brought by all Plaintiffs on behalf of the FLSA Kronos Collective); *id.* at ¶¶ 103-110; (Second Cause of Action: New York Labor Law: Late Payment- Brought by all Plaintiffs on behalf of the New York Late Payment Class); *id.* at ¶¶ 111-122 (Third Cause of Action: Fair Labor Standards Act: Overtime Rate- Brought on behalf of Plaintiffs Greene, Armor, and Saugar on behalf of the FLSA Shift Differential Collective); *id.* at ¶¶ 123-130 (Fourth Cause of Action: New York Labor Law: Overtime Rate- Brought on behalf of Plaintiffs Greene, Armor, Saugar, and the New York Shift Differential Class).

D.  *Procedural History*

On June 3, 2022, Plaintiffs filed their Complaint against Defendants, *see* ECF 1, which was amended on July 28, 2022.  *See* ECF 24.

On December 23, 2022, Defendants filed their Motion to Dismiss Plaintiffs' Complaint In Part and supporting materials.  *See* ECF 46-47.

On January 27, 2023, Plaintiffs filed their Opposition ("Opp.") to Defendants' Motion to Dismiss Plaintiffs' Complaint In Part and supporting materials.  *See* ECF 50-51.

On February 14, 2023, Defendants filed their Reply in Support of Their Motion to Dismiss Plaintiffs' Complaint In Part and supporting materials.  *See* ECF 53-54.

On February 28, 2023, Plaintiffs filed a letter Motion to Leave to File a Sur-Reply in Support of their Opp., *see* ECF 55, which the Court granted on March 2, 2023.  *See* ECF entry dated March 2, 2023.

On March 2, 2023, Plaintiffs filed their Sur-Reply in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint In Part.  *See* ECF 56.

On June 27, 2023, Defendants filed a Letter Advising the Court of a New York Appellate Division decision relevant to the instant Motion.  *See* ECF 59.[2]  Plaintiffs filed a Letter in Response to Defendants' Letter Re Astro Ready Mix v. MTA Long Island Railroad Decision on June 30, 2023.  *See* ECF 60.

On October 18, 2023, the Honorable Joan M. Azrack referred the instant Motion to the undersigned to issue a Report and Recommendation.  *See* ECF entry dated October 18, 2023.

## II.     JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  Plaintiffs' state law claims are so closely related to their FLSA claims that they form part of the same case or controversy under Article III of the United States Constitution.  Additionally, this Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

## III.    APPLICABLE LEGAL STANDARD

When assessing a Rule 12(b)(6) motion to dismiss, a court must determine whether the complaint states a legally cognizable claim by making allegations that, if proven, would show that the Plaintiff is entitled to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  *Twombly* and *Iqbal* command that all elements of the Plaintiff's claim must be plausibly alleged in the complaint, such that the complaint contains more than "naked assertions," or allegations that amount to "sheer possibility," containing instead "factual content that allows the court to draw the reasonable inference that the Defendant is liable

---

[2] Note, this Court will discuss the case *Astro Ready Mix, LLC v. MTA Long Island R.R.*, 217 A.D.3d 816 (2d Dep't 2023) *infra*.

for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

In assessing a motion to dismiss under Rule 12(b)(6), the Court "must accept all factual allegations as true and draw all reasonable inferences in favor of the non-moving party." *Giambrone v. Meritplan Ins. Co.*, 13-CV-7377 (MKB) (ST), 2017 WL 2303980 at *3 (E.D.N.Y. Feb. 28, 2017) (internal quotation marks, citation omitted) (*adopted by Giambrone v. Meritplan Ins. Co.,* 13-CV-7377, 2017 WL 2303507 (E.D.N.Y. May 24, 2017)).  However, a complaint may be dismissed where it fails to plead enough facts "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## IV.    DISCUSSION

### A.    <u>This Court Concludes that Plaintiffs' NYLL Claims Should Be Dismissed</u>

This Court concludes that Plaintiffs' NYLL claims should be dismissed under Rule 12(b)(6).  As discussed *supra*, Plaintiffs bring two separate claims under the NYLL: (1) unpaid (or improperly calculated) overtime wages; and (2) untimely payment of wages.  *See* Pl. First Am. Compl. ¶¶ 103-110; (Second Cause of Action: New York Labor Law: Late Payment- Brought by all Plaintiffs on behalf of the New York Late Payment Class); ¶¶ 123-130 (Fourth Cause of Action: New York Labor Law: Overtime Rate- Brought on behalf of Plaintiffs Greene, Armor, Saugar, and the New York Shift Differential Class).  This Court will address Plaintiffs' NYLL overtime claims first and then proceed to the untimely payment of wages claim.

#### 1.    *This Court Concludes that Plaintiffs' Overtime Claims Under the NYLL Should Be Dismissed*

This Court concludes that Plaintiffs' overtime claims under the NYLL should be dismissed. Plaintiffs' overtime claims are made pursuant to the Minimum Wage Order for Miscellaneous

Industries and Occupations (12 N.Y.C.R.R. § 142-2.2) (the "Minimum Wage Order").  *See* Pl. First Am. Compl. ¶ 128.  The Minimum Wage Order is issued by the Commissioner of Labor pursuant to Article 19 of the NYLL.  *See* N.Y. Lab. Law § 655.  Importantly, Article 19 contains a specific definition section, separate and apart from the definition section of Article 6, under which Plaintiffs' frequency of pay claims are brought.  In relevant part for the Court's below analysis, Article 19 of the NYLL defines "Employee" as "any individual employed or permitted to work by an employer in any occupation, *but shall not include any individual who is employed or permitted to work: . . . by a federal, state or municipal government or political subdivision thereof . . . .*"  *See* N.Y. Lab. Law § 651(5)(m) (emphasis added).

Per upon the above principles, the key question is whether the MTA and its subsidiaries and affiliates are a "political subdivision."  If Defendants constitute a political subdivision, there is no question that they are exempt from Article 19 of the NYLL.  For the following reasons, this Court concludes that Defendants are exempt as a political subdivision.  Based upon the parties' briefing about the case *Lucia Vlad-Berindan v. NYC Metro. Transportation Auth.*, No. 14CV10304VECFM, 2016 WL 1317700, at *4 (S.D.N.Y. Apr. 1, 2016), *aff'd sub nom. Vlad-Berindan v. NYC Metro. Transportation Auth.*, 779 F. App'x 774 (2d Cir. 2019) and its application of the test articulated in *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382 (1987), this Court will begin its analysis with that precedent.[3]  In short, upon the Court's own review of the case law, *Vlad-Berindan* is the most persuasive case on point here because the SDNY concluded

---

[3] To highlight the weight *both* parties put on the *Vlad-Berindan* case, this Court notes the following statements from the parties' briefing.  First, Defendants assert that the "operative [and precise] question" of "whether the MTA and its subsidiaries and affiliates are a 'political subdivision'" was addressed in *Vlad-Berindan*.  *See* Defendants' Mot. at 4. Second, Plaintiffs assert that: "Although the *Vlad-Berindan* court noted that *Clark-Fitzpatrick* was about punitive damages, it went on to apply the *Clark-Fitzpatrick* factors, without explanation, to a NYLL claim that sought compensatory, not punitive damages. . . It applied the *Clark-Fitzpatrick* factors and concluded that the MTA served a public function and received 'substantial government funding.'"  *See* Plaintiffs' Opp. at 8.  In other words, Plaintiffs' Opp. at 8 concedes that *Vlad-Berindan* has the opposite outcome that Plaintiffs seek here.  Instead, Plaintiffs merely assert that *Vlad-Berindan* was wrongly decided.  *Id.*  Hence, *Vlad-Berindan* warrants careful attention *infra*.

that the MTA was a political subdivision and, therefore, exempt from the NYLL requirements.

In *Vlad-Berindan*, the plaintiff filed multiple claims against the MTA and NYCTA, including claims of unpaid wages under the FLSA and NYLL. *Lucia Vlad-Berindan*, 2016 WL 1317700, at *1. The Defendants moved to dismiss the plaintiff's NYLL claims and argued that the plaintiff was not an "employee" under N.Y. Lab. Law § 651(5)(m).[4] *Id.* at 4. In turn, the plaintiff asserted that she was an employee since the MTA is not a political subdivision. *Id.* Importantly, the Court dismissed the plaintiff's NYLL claims while primarily relying upon *Clark-Fitzpatrick, Inc.* mentioned above. *Id.* at 4-5. Furthermore, the Court applied *Clark-Fizpatrick Inc.* even though plaintiff did not seek punitive damages.[5]

The key issue in *Clark-Fitzpatrick* that the New York Court of Appeals considered is whether the Long Island Rail Road ("LIRR") is immune from punitive damages under the political subdivision exemption. The New York Court of Appeals noted two factors that must be considered when answering this question: (1) the essential government function served by the entity; and (2) the public source of much of the entity's funding. *See Clark-Fitzpatrick*, 70 N.Y.2d at 386-88.

First, regarding the "essential government function" factor, the New York Court of Appeals noted that the MTA enabling statute explicitly provides that the MTA: "shall be regarded as performing an essential governmental function." *Id.* at 387 (quoting Public Authorities Law § 1264[2]). Second, for the "public funding," the Court highlighted that: "49% of [the LIRR's] total expenses were financed from outside subsidies, most of which were derived from public sources." *Id.* at 388. Finally, after applying these two factors, the New York Court of Appeals concluded that: "given the essential governmental purpose that [the LIRR] serves, and considering the public

---

[4] Note, *Lucia Vlad-Berindan*, 2016 WL 1317700, at *1 appears to refer to N.Y. Lab. Law § 651(5)(n) instead of N.Y. Lab. Law § 651(5)(m) (the correct section concerning political subdivisions) in typographical error.
[5] This is relevant to the discussion *infra* since Plaintiffs do not seek punitive damages here. As discussed *infra*, this Court concludes *Clark-Fitzpatrick* applies even outside the punitive damages context.

sources of much of its funding, we hold that [the LIRR] should be exempt from the imposition of punitive damages" under the political subdivision exemption.

Building from the New York Court of Appeals holding in *Clark-Fitzpatrick*, Defendants argue that the same reasoning applies here under *Vlad-Berindan*. Specifically, Defendant's Mot. at 5 argues that: "The MTA still 'shall be regarded as performing an essential government function' and still receives nearly half its funding from public sources. Accordingly, the same conclusion must follow – the MTA is a 'political subdivision' for purposes of exemption under Article 19 of the NYLL." Moreover, Defendants' Mot. at 5-6 correctly notes that: "While *Clark-Fitzpatrick* involved a claim for punitive damages rather than claims under the NYLL, the *Vlad-Berindan* court explicitly held that the analysis set forth in *Clark-Fitzpatrick* should be applied to determine whether certain public benefits corporations are 'political subdivisions' for purposes of exemption from the NYLL." Indeed, Defendants also correctly note that the *Vlad-Berindan* Court held that the MTA is exempt from the NYLL and dismissed the plaintiff's state law minimum wage claims. *See* Defendants' Mot. at 6 (citing *Vlad-Berindan*, 2016 WL 1317700, at *4-5). For these reasons, this Court agrees with Defendants that Plaintiffs' NYLL overtime claims at issue in the instant Motion should be dismissed under *Vlad-Berindan*.

Notably, Plaintiffs do not attempt to dispute that their overtime claims fail under *Vlad-Berindan* if that case applies. Rather, Plaintiffs' attempt to distinguish *Vlad-Berindan* hinges upon whether the decision *Massiah v. MetroPlus Health Plan, Inc.*, 856 F. Supp. 2d 494, 498 (E.D.N.Y. 2012) contains the proper application of *Clark-Fitzpatrick* instead of *Vlad-Berindan*. *See* Plaintiffs' Opp. at 7. Hence, this Court will summarize Plaintiffs' argument and then discuss the *Massiah* decision. In short, however, this Court concludes that *Vlad-Berindan* is the most persuasive application of *Clark-Fitzpatrick* given that *Massiah* has been questioned by multiple

courts.  Alternatively, this Court further concludes that even under the nonbinding case *Massiah*, Plaintiffs' NYLL overtime claims should still be dismissed anyway.  Plaintiffs' argument applying *Massiah* in relation to *Clark-Fitzpatrick* is as follows.

Regarding *Clark-Fitzpatrick*, Plaintiffs correctly highlight that the New York Court of Appeals held that public benefit corporations ("PBCs") may be treated like government entities "for some purposes" based on a "particularized inquiry to determine whether -- *for the specific purpose at issue* -- the public benefit corporation should be treated like the State." *Clark-Fitzpatrick*, 70 N.Y.2d at 387 (emphasis added).  Plaintiffs are also correct that *"Clark-Fitzpatrick* applied such a '*particularized inquiry'* to the '*specific purpose'* of deciding whether the Long Island Rail Road Company ("LIRR") – a PBC and an MTA subsidiary – was immune from claims for punitive damages in a case involving common-law tort claims."  *See* Plaintiff's Opp. at 7 (emphasis added) (citing *Id.* at 387).

Per the above "particularized inquiry" language, Plaintiffs then solely rely upon *Massiah v. MetroPlus Health Plan, Inc.*, 856 F. Supp. 2d 494, 498 (E.D.N.Y. 2012) and argue that *Massiah* "correctly followed *Clark-Fitzpatrick* by conducting a 'particularized inquiry' into whether another PBC, the New York City Health and Hospitals Corporation and its subsidiary MetroPlus, were immune from NYLL liability."  *See* Plaintiffs' Opp. at 7.  Most importantly, Plaintiffs emphasize that: "The *Massiah* court considered not only the two factors considered by *Clark-Fitzpatrick* – public function and funding – *but also the underlying policy concerns of the statute at issue*, asking 'whether the aims and goals of the [the NYLL] are furthered' by defining a PBC as a state actor." *Id.* (citing *Massiah*, 856 F. Supp. 2d at 499) (citations omitted) (emphasis added).  Thus, Plaintiffs assert that: "The *Massiah* court explained that *Clark-Fitzgerald* was fact-specific and relied on the premise that 'the purposes of punitive damages were not furthered by penalizing

the LIRR *in that instance*.'"  *Id.* (emphasis added).

Applying the above principles, Plaintiffs argue that: "*Vlad-Berinden* thus failed to apply the 'particularized inquiry' *Clark-Fitzpatrick* requires and was wrongly decided."  *See* Opp. at 8-9.  Hence, the pivotal question is whether *Massiah* governs here over *Vlad-Berinden* and, if so, whether *Massiah* compels Plaintiffs' desired outcome in the present case.  As noted above, this Court reiterates that *Massiah's* reasoning has been questioned by multiple courts which, though not binding here, further bolster this Court's recommendations below.  Furthermore, this Court also concludes that even if *Massiah* applies, Defendants here are still exempt under the NYLL. This Court will address each of these points in turn.

First and foremost, multiple courts have questioned *Massiah's* reasoning.  Specifically, *Brown v. Great Neck Park Dist.*, No. 221CV5484LDHSIL, 2023 WL 2666878, at *3 (E.D.N.Y. Mar. 27, 2023)[6] held the following when a plaintiff sought to apply the *Massiah* factors: "The Court notes that, although well-reasoned, the factors the court developed in *Massiah* were not derived from New York case law. . . And, the test articulated in *Massiah* has been considered and rejected by other courts."  *See id.* (citing *Ali v. N.Y.C. Health & Hosps. Corp.*, No. 11-CV-6393, 2013 WL 1195794, at *3 n.4 (S.D.N.Y. Mar. 25, 2013) (rejecting *Massiah* court factors, noting that the court "failed to cite any authority for the factors it considered"); *Cromwell v. N.Y.C. Health & Hosps. Corp.*, 983 F. Supp. 2d 269, 276 n.7 (S.D.N.Y. 2013) (questioning and rejecting *Massiah* factors)); *see also* Defendants' Reply at 8.  Based upon the above authority, this Court concludes that *Vlad-Berindan* provides the most persuasive application of *Clark-Fitzpatrick* and that Plaintiffs' NYLL overtime claims at issue here should be dismissed for that reason alone.

---

[6] This Court notes that *Brown v. Great Neck Park Dist.*, No. 221CV5484LDHSIL, 2023 WL 2666878, at *3 (E.D.N.Y. Mar. 27, 2023) post-dates the filing of Defendants' Reply, which is dated February 14, 2023.  However, Defendants' Reply at 7 refers to the same precedent noted above that the *Brown* court cites.  *Compare* Defendants' Reply at 8 and *Brown*, 2023 WL 2666878, at *3.

Alternatively, as in *Brown*, this Court concludes that: "The Court need not weigh in on the soundness of the *Massiah* test, however, because even if the Court agreed that it should be applied here, *the Court's determination would remain unchanged*." *See Brown*, 2023 WL 2666878, at *3 (emphasis added).    Thus, this Court concludes that *Massiah* does not change this Court's recommendation that Defendants' Motion should be granted with respect to Plaintiffs' NYLL overtime claims even if *Massiah applied*.[7]

More specifically, after reviewing *Massiah*, this Court agrees with Defendants' Reply at 7 that Plaintiffs "largely ignore[ed] the first [and] second factors" of the *Massiah* opinion itself.  The EDNY provided in *Massiah* that there are *three* factors to consider: (1) the degree to which the corporation "dominates the service area in which it operates"; (2) whether the corporation "is similar to its counterparts in the private or not-for-profit sector"; and (3) when considering the aims and goals of the NYLL, "whether there is any reason why the corporation should be exempted from compliance."  *Massiah*, 856 F. Supp. 2d at 498.

Regarding the first factor, *Massiah* provides that the pertinent question is whether the corporation "is the sole provider of the service, which would tend to make it look like a state agency, or is it one of a number or providers, which would cause it to resemble a private provider?" *Id.* at 498.  This Court agrees with Defendants that this factor strongly favors granting Defendants' Motion here because Defendants are the sole (or at least nearly sole) provider of its rail transportations services.  *See* Defendants' Reply at 7.  Plaintiffs' Opp. at 9 essentially concedes this point by admitting that: "the MTA effectively enjoys a *railroad monopoly*. . ." (emphasis

---

[7] This Court also concludes that Plaintiffs' reliance on *Long Island R. R. Co. v. Long Island Lighting Co.*, 103 A.D.2d 156, 164-65 (2nd Dept. 1984) ("LIRR enjoys a separate existence from the State pursuant to which it transacts its own nongovernmental business and hires, compensates and fires its own personnel" and concluding that it was therefore not exempt from a taking by another state agency) as a *cf* cite is also misplaced.  *See* Plaintiffs' Opp. at 8.  That Second Department case, unlike the present case before this Court, concerned potential exemption under the Transportation Corporations Law, which is not at issue here.  Moreover, the Second Department decision (decided in 1984) also predates *Clark-Fitzpatrick* (decided in 1987) discussed *supra*.

added).

Plaintiffs' only attempt to circumvent the weight of this admission is to make a broad policy argument and assert that "after all, the NYLL describes substandard labor conditions as a form of unfair competition 'against other employers *and their employees*.'" (citing N.Y. Lab. Law § 650) (emphasis added).  However, Defendants correctly note the logical deficiency in Plaintiffs' position, which is that: "By extension, this would mean that *all employers* meet the first *Massiah* factor, because all companies ultimately compete for employees with all other companies. Thus, to apply Plaintiffs' interpretation of this factor *would be to make it meaningless*."  *See* Defendants' Reply at 8 (emphasis added).  Indeed, even *Massiah* itself contrasts the facts of its decision with the Long Island Rail Road's monopoly by stating the following:

> "I see no reason why HHC and MetroPlus should be excused from paying their employees the wages required by New York law. First, unlike the *Long Island Railroad*, which, by the time of *Clark–Fitzpatrick*, had become *the sole provider of commuter rail services* between Long Island and New York City, over fifty hospitals can be found in New York City—only eleven of which are run by HHC"

*Massiah*, 856 F. Supp. 2d at 498 (emphasis added).  When considering that Plaintiffs' interpretation would render the first *Massiah* factor meaningless, coupled with the *Massiah* Court's own contrast of the Long Island Rail Road, this Court concludes that the first factor clearly favors Defendants here.

As to the second *Massiah* factor, whether the corporation "is similar to its counterparts in the private or not-for-profit sector," this Court agrees with Defendants that Plaintiffs ignore the weight of this factor as well.  *See* Defendants' Reply at 7.  Notably, the *Massiah* Court stated the following, among other things, when concluding the second factor did not favor exemption for Defendants in that case: "The fact that approximately 65% of patients served by HHC are insured suggests that revenue is largely derived from *third parties* in the form of Medicaid and Medicare

reimbursements rather than from the city" and "*Only 4%* of HHC's budget was funded by State or City governments."  *See Massiah*, 856 F. Supp. 2d at 499 (emphasis added).[8]  Here, by contrast, Plaintiffs concede that MTA receives "nearly half its funding from public sources. . ."  *See* Plaintiffs' Opp. at 9.

To the extent Plaintiffs' Opp. at 9 argue that: "this public funding does not preclude 'substantial budgetary independence,' including the ability to contract," (citing *Massiah*, 856 F. Supp. 2d at 499), this Court again reiterates that central to the *Massiah* Court's application of the second factor was the fact that "revenue is largely derived from third parties in the form of Medicaid and Medicare reimbursements rather than from the city."  *Massiah*, 856 F. Supp. 2d at 499.  In other words, Plaintiffs have identified no case law, nor has this Court been able to find any, with a factual posture showing that the second *Massiah* factor favors Plaintiffs' position here given that *nearly half* of the MTA's funding is from public sources.  Hence, this Court concludes that the second factor strongly favors Defendants as well.

As for the third factor, "whether the aims and goals of the statute are furthered by defining a corporation a given way," *see Massiah*, 856 F. Supp. 2d at 499 (citations omitted), this Court agrees that Plaintiffs make a plausible broad policy argument *if policy was the only factor to be considered* in the *Massiah* analysis.  Specifically, Article 19 of the NYLL provides in relevant part that:

> There are persons employed in some occupations in the state of New York at wages insufficient to provide adequate maintenance for themselves and their families. Such employment impairs the health, efficiency, and well-being of the persons so employed, constitutes unfair competition against other employers and their employees, threatens the stability of industry, reduces the purchasing power of employees, and requires, in many instances, that wages be supplemented by the payment of public moneys for relief or other public and private assistance.

---

[8] To be clear this Court is not stating that funding was the *Massiah* Court's *only* consideration when discussing the second factor.  However, funding and "substantial budgetary independence" certainly appear to be the *Massiah* Court's *main focus* when discussing the second factor's application.  *See Massiah*, 856 F. Supp. 2d at 499.

> Employment of persons at these insufficient rates of pay threatens the health and well-being of the people of this state and injures the overall economy.
>
> Accordingly, it is the declared policy of the state of New York that *such conditions be eliminated as rapidly as practicable* . . . .

N.Y. Lab. Law § 650 (emphasis added). Thus, Plaintiffs' broad policy argument is that: "[a]s an employer, MTA should not be entitled to use the fact that it is supported by taxpayer money to avoid the same wage and hour laws that apply to other employers in New York." *See* Plaintiffs' Opp. at 9. However, as discussed above, policy is not the *only* factor under *Massiah* and the other factors favor Defendants on balance. Therefore, this Court concludes that even under *Massiah*, Defendants Motion should be granted with respect to Plaintiffs' overtime claims under the NYLL.

Finally, this Court is also not persuaded by Plaintiffs' argument that: "MTA should further be held liable for its NYLL violations because Plaintiffs here, unlike in *Clark-Fitzpatrick*, do not seek punitive damages." *See* Plaintiffs' Mot. at 10. As Plaintiffs' Opp. at 8 concedes, *Vlad-Berindan* discussed *supra* applied the *Clark-Fitzpatrick* factors "to a NYLL claim that sought compensatory, not punitive damages." *Massiah*, Plaintiffs' sole case, does not address the punitive v. compensatory damages distinction. Moreover, this Court also agrees with Defendants' Reply at 9 that Defendants' arguments do not turn on whether "liquidated damages under the NYLL are punitive." Rather, the key inquiry is whether Plaintiffs are employees under Article 19 of the NYLL *at all*. Since this Court concludes that Plaintiffs are *not* covered employees, this Court also concludes that Plaintiffs are not entitled to *any* damages under Article 19.

For the above reasons, this Court concludes that Defendants' Motion should be granted with respect to Plaintiffs' NYLL overtime claims regardless of whether *Massiah* applies.

### 2. *This Court Concludes that Plaintiffs' Frequency of Pay Claims Under the NYLL Should Be Dismissed*

This Court concludes that Plaintiffs' frequency of pay claims under the NYLL should also

be dismissed.  Plaintiffs' second cause of action pleads untimely wages in violation of NYLL § 191, a claim which arises from Article 6 of the NYLL.  *See* Pl. First Am. Compl. at ¶ 108.  In relevant part, NYLL § 191 requires employers to pay railroad workers "on or before Thursday of each week the wages earned during the seven-day period ending on Tuesday of the preceding week . . . ."  *See* N.Y. Lab. Law § 191.  While Article 19 of the NYLL excludes certain *individuals* from its definition of employee, Article 6 exempts certain classes of *employers* from coverage under the NYLL.  *Id.*  Importantly, N.Y. Lab. Law § 190(3) defines "employer" to exclude governmental agencies.  Hence, the key inquiry is whether the MTA and its subsidiaries constitute an exempt "governmental agency."  For the following reasons, this Court concludes that the exemption applies.

In support of their position, Defendants' Mot. at 6 relies upon *D'Antonio v. Metro. Transp. Auth.*, No. 06 CV 4283 (KMW), 2008 WL 582354, at *5 (S.D.N.Y. Mar. 4, 2008), which held that: "The MTA and NYCTA are both governmental agencies, and therefore do not fall under the terms of this statute."  (citing *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328, 338 (D. Conn. 2007) ("The MTA ... is considered a state agency under New York law."); *Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 96 (E.D.N.Y.2004) ("NYCTA is a government agency of the City of New York . . .")).  Upon this Court's own review of the applicable case law, this Court concludes that *D'Antonio* is the most persuasive case regarding the NYLL frequency of pay issues because it is the only case answering the specific question of whether the MTA and NYCTA are covered "employers" under the Article 6 of the NYLL.  *D'Antonio*, 2008 WL 582354, at *5.  This Court concludes that *D'Antonio* favors Defendants' position and is instructive here.

In *D'Antonio*, the facts involved Defendants' alleged wrongful diversion of money from Plaintiffs' employee retirement health benefit funds.  In relevant part for this Court's analysis *infra*,

18

Defendants moved to dismiss Plaintiff's NYLL claim under New York Labor Law § 193(1)(b) arguing that defendants MTA and NYCTA are government agencies and are, therefore, exempt under Article 6 of the NYLL.  The Court in *D'Antonio* ultimately concluded that: "Plaintiffs do not offer contrary authority or even respond to the MTA and NYCTA's argument.  The Court therefore concludes that New York Labor Law § 193(1)(b) *does not apply to the MTA or NYCTA*, and dismisses claims 8 and 17."  *D'Antonio*, 2008 WL 582354, at *5 (emphasis added).  In making this conclusion, the Court relied upon the plain text of Article 6 and noted that:

> New York Labor Law § 193(1)(b) states that *"[n]o employer* shall make any deduction from the wages of an employee, except deductions which ... are expressly authorized in writing by the employee and are for the benefit of the employee." The statute provides that "[t]he term 'employer' shall not include a governmental agency." N.Y. Labor Law § 190(3). The MTA and NYCTA are both governmental agencies, and therefore do not fall under the terms of this statute.

*Id.* (emphasis added).  Notably, the Court further highlighted that: "Plaintiffs *do not offer contrary authority* or even respond to the MTA and NYCTA's argument."  *Id.* (emphasis added).

Like in *D'Antonio*, Plaintiffs' Opp. and Sur-Reply does not "offer any contrary authority" here and merely attempts to distinguish the *D'Antonio* decision.  Specifically, Plaintiffs' Opp. at 5 provides that: "[t]he sole case MTA cites in support of its argument is inapposite because it applies a different section of NYLL, § 193, which is not at issue here, and which, unlike § 191, does not include explicit language naming MTA."  Moreover, Plaintiffs argue that the: "*D'Antonio* court did not analyze whether MTA was an employer, because the plaintiffs did not 'offer contrary authority or even respond to the MTA and NYCTA's argument.' (citing *D'Antonio*, 2008 WL 582354, at 5).  *D'Antonio* is inapplicable and provides no persuasive basis to countermand the Legislature's clear intent."  This Court concludes that Plaintiffs' attempts to distinguish *D'Antonio* are unpersuasive for the following reasons.

First, Plaintiffs' main argument that *D'Antonio* is inapplicable because it applies a different

section of the NYLL, § 193, which is not at issue here, and which, unlike § 191, does not include explicit language naming MTA, fails as a matter of statutory interpretation.  Indeed, as Plaintiffs' Sur-Reply at 2 concedes "[t]t is black letter law that statutory interpretation *must begin with the text of the statute*, applying all of the 'traditional tools' of statutory construction, before turning to extraneous material like legislative history." (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (courts must first exhaust interpretive tools before deeming a regulation sufficiently ambiguous to confer *Auer* deference to an agency interpretation)).  Contrary to Plaintiffs' assertions otherwise, this Court concludes that the MTA and its subsidiaries *are* exempt as a matter of statutory interpretation, as articulated in *D'Antonio*.  As noted both above and in *D'Antonio*, 2008 WL 582354, at 5, under N.Y. Labor Law § 190(3), "[t]he term 'employer' shall not include a governmental agency."

Per the language quoted above, *D'Antonio* correctly relied upon the definition of employer *for all of Article 6* of the NYLL when citing to N.Y. Labor Law § 190.  Indeed, the very beginning of Section 190 provides the following before the definitions listed: "As used in this *article*: . . ." (emphasis added).  Hence, Plaintiffs' contention that *D'Antonio* is not on point simply because it refers to a different section of the NYLL, which uses the *same* definition of "employer" governing *all of Article 6*, fails as a matter of plain text.

To be clear, the Court is cognizant of Plaintiffs' argument in their Opp. at 5 that: "the Legislature's specific inclusion of the MTA by name in § 191(b), which presumes that it is among the class of railroad employers that are covered by NYLL, proves that the more general exclusion of 'governmental agencies' from the definition of 'employers' in § 190 does not apply to MTA."  Specifically, Plaintiffs argue that: "The Legislature would not have included plain language in § 191 that specifically references MTA if it also intended the general language of Article 6 to exclude

MTA from coverage."

This Court is not going to speculate why the Legislature mentioned the MTA in one section of Article 6, but not the other.  Again, what *is* clear is that the plain text of Section 190 provides the following before all the definitions listed: "As used in this *article*: . . ." (emphasis added), meaning the definitions apply to the *entirety of* Article 6.  Relatedly, this Court agrees with Defendants' Reply at 2 that Plaintiffs' argument fails as a matter of logic when asserting that: "because the MTA is mentioned (albeit as specifically exempt from the mailing requirement), the legislature must have intended the MTA to be covered by all other parts of Article 6."  Notably, Plaintiffs have not identified any case law to the contrary, nor has this Court been able to find any, and this Court is not going to defer to Plaintiffs' speculative theories of why the MTA was specifically mentioned later in Section 191.

To reiterate, "[w]ith any question of statutory construction, a court must first examine 'the text of the statute to determine whether the language at issue has a plain and unambiguous meaning.'" *C.W. v. City of New York*, 322 F. Supp. 3d 344, 348 (E.D.N.Y. 2018) (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017)).  Hence, the canons of statutory interpretation are only meant to be used *when the text is ambiguous*, which is not the case here as discussed above.  *Id.* at 348-49 ("If the meaning [of the statutory text] is plain, the inquiry ends there.") (quoting *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016)).  Therefore, as a matter of plain text, this Court concludes that Plaintiffs' Frequency of Pay Claims under the NYLL should be dismissed.[9]

---

[9] Note, this Court further concludes that Plaintiffs' remaining statutory interpretation arguments and related assertions about legislative history are also unpersuasive.  First, Plaintiffs' Sur-Reply at 2 n.1 argues that: "To the extent MTA argues that the 'governmental agency' language applies to MTA as a matter of plain text, it is wrong.  New York courts have been clear that a public benefit corporation like MTA is 'not identical to the State or any of its agencies.'" (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 386-87 (1987) (emphasis added)).  Yet, Plaintiffs ignore the further holding in *Clark-Fitzpatrick* discussed *supra*, which is that: "[W]e hold, in light of the essential public function served by defendant [LIRR] in providing commuter transportation and the public source of much of

### 3. *This Court Concludes that Plaintiffs' FLSA Claims Should Be Dismissed*

This Court concludes that Plaintiffs' FLSA claims should be dismissed as well.[10]  The FLSA provides that the maximum hour provisions of 29 U.S.C. § 207 "*shall not apply with respect to . . . any employee of an employer engaged in the operation of a rail carrier* subject to [the Interstate Commerce Act ("ICA")]." *See* 29 U.S.C. § 213 (emphasis added).  *See also Farley v. Metro N. Commuter R.R.*, 690 F. Supp. 268, 269 (S.D.N.Y. 1988), *aff'd*, 865 F.2d 33 (2d Cir. 1989) ("The defendant, Metro-North, is a common carrier by rail continuing the business of its predecessor railroads in transporting passengers throughout the New York City area and Connecticut along the Harlem, Hudson, and New Haven Lines.").  Upon this Court's own review of the pertinent case law and the parties' briefing, this Court concludes that the *Farley* case is on point here because it provides that entities, such as Defendants here, are exempt from the FLSA requirements.  This Court also concludes that any legislative amendments since *Farley* do not impact this holding.  Hence, this Court will first review the *Farley* decision and then explain its

---

its funding, that defendant should receive the same immunity from punitive damages as do the State and its political subdivisions."  Thus, since the "government agency" language is intended to apply to *all* of Article 6 as a matter of plain text, and *Clark-Fitzpatrick* construes the Long Island Railroad as entitled to the "same immunity" as state political subdivisions, this Court again concludes Defendants are exempt here.  Second, to the extent the parties have briefed legislative history issues and Plaintiffs object that Defendants' legislative history materials are "extraneous," *see* Plaintiffs' Sur-Reply at 2-3, this Court reiterates that the *plain text* of Article 6 governs and the analysis stops there.  Third, this Court also notes that contrary to Plaintiffs' contentions otherwise, it is not prohibited from researching a statute's legislative history on its own per the above precedent concerning statutory interpretation.  Hence, there are no concerns of the instant Motion being converted to a Motion for Summary Judgment *even if* this Court considered legislative history in the Court's analysis.  However, legislative history is not necessary here anyway.

[10] Recall that Plaintiffs' FLSA claims include: Pl. First Am Compl. at ¶¶ 91-102 (First Cause of Action: Fair Labor Standards Act: Late Payment- Brought by all Plaintiffs on behalf of the FLSA Kronos Collective); *id.* at ¶¶ 111-122 (Third Cause of Action: Fair Labor Standards Act: Overtime Rate- Brought on behalf of Plaintiffs Greene, Armor, and Saugar on behalf of the FLSA Shift Differential Collective).  Moreover, this Court also notes that: "Defendants do not concede that non-railroad workers assert viable FLSA claims."  *See* Defendants' Reply at 9.  In other words, while Plaintiffs' Opp. at 11 asserts that: "MTA does not seek to dismiss the claims of any non-'Railroad Workers,' and therefore concedes that they state a claim under the FLSA," Defendants are correct that future motions regarding dismissal of claims for non-railroad workers may be made, such as a motion for summary judgment.  Finally, to clarify the scope of this Court's Report and Recommendation, the Court notes that *both* parties concede the instant Motion *only* applies to "railroad workers."  *See* Plaintiffs' Opp. at 11 ("MTA does not seek to dismiss the claims of any non-'Railroad Workers…'"); Defendants' Reply at 9 ("First, with respect to Plaintiffs' first cause of action, Defendants have simply made the decision not to make a motion to dismiss as to all Plaintiffs; only the Railroad Plaintiffs.");  Defendants' Reply at 10 ("Accordingly, as the non-Railroad Plaintiffs have not even brought a cause of action under the FLSA for overtime, thus there was no need for Defendants to make a motion to dismiss such non-claims.").

applicability here.

In *Farley*, railroad employees employed by Metro North Commuter Railroad sought to recover unpaid overtime compensation allegedly owed to them under the Fair Labor Standards Act. *Id.* at 269. Importantly, the SDNY, later affirmed by the Second Circuit, held that the railroad defendant, which was partially exempted from Interstate Commerce Act requirements, was not subject to maximum hour provisions of Fair Labor Standards Act. *Id.* at 272. In reaching that holding, the SDNY provided a helpful discussion of the FLSA's history in relation to the Interstate Commerce Act ("ICA"). *Id.* at 270. Specifically, "[t]he two-fold purpose of the FLSA's overtime requirements are to place financial pressure on employers to hire more workers and to compensate employees for the burden of working overtime." *Id.* (citations omitted). Yet, "[i]n drafting the FLSA, however, Congress recognized that certain employees did not need the protection of the Act. Accordingly, section 13 of the FLSA exempts certain employers from the requirements of § 7, including in § 13(b)(2) 'carriers by rail subject to the provisions' of the ICA." *Id.* "The exemptions are designed to keep the FLSA from interfering in industries already subject to federal regulations," which the legislative history of the FLSA describes as follows:

> [I]t was the policy of the committee, in cases where regulation of hours and wages are given to other government agencies, to write the bill in such a way as not to conflict with such regulation ... It was taken with reference to railroad workers insofar as they were governed by the Hours of Service Act ... [I]t is my belief that it would certainly be unwise to have the hours of service regulated by two governmental agencies. I am further of the opinion that the Interstate Commerce Commission, since it has the power and has exercised it, should be the agency to be entrusted with this duty.

*See id.* (quoting 81 Cong. Rec. 7875 (daily ed. July 30, 1937) (Statement of Sen. Black)):

The *Farley* Court further explained that "while there is no federal regulation specifically regulating the wages of railroad employees, Congress has addressed railroad labor matters in a series of acts since 1888. Included among these acts is the Hours of Service Act which regulates

railroad employees hours." *Id.* "This series of acts, as well as the development of labor unions, protected the rights and interests of railroad employees. Accordingly*, Congress saw no need to further protect these employees by including them within the purview of the FLSA*." *Id.* (emphasis added).

Relevant to this Court's discussion *infra*, the plaintiffs in *Farley* argued that: "Congress did not mean to extend the FLSA exemption to all interstate railroads but only to those 'subject to the provisions' of the ICA. As the defendant obtained a 49 U.S.C. § 10505 exemption from ICA provisions, the plaintiffs argue that the defendant cannot also be subject to such provisions as specified by the language of § 13(b)(2)." *Id.* at 271 (citations omitted). Importantly, the *Farley* Court reasoned that: "[i]t is apparent, however, that the plaintiffs' reading of § 13(b)(2) is contrary to the intent of Congress. In 1937, when § 13(b)(2) was drafted, all interstate railroads were subject to the ICA. At that time, the legislature could not have foreseen the great increase in state regulation, the heightened competition facing railroads, and the subsequent need for deregulation eventually codified in 49 U.S.C. § 10505 in 1978 and amended by the Staggers Rail Act in 1980." *Id.* "The language of 13(b)(2) was not meant to subject deregulated railroads to other statutory provisions, but to encompass the scope of the ICC's jurisdiction without entering into the complications of defining that scope." *Id.*

The *Farley* Court then discussed the ICA in more depth relevant to the present case. Specifically, "in 1980 the ICA was amended by the Staggers Rail Act which provides in 49 U.S.C. § 10505 that the ICC can exempt parties from certain ICA requirements. Such exemptions are to be granted if the requirements are not necessary to carry out the transportation policy of § 10101 and the transaction or service exempted is of limited scope or the application of the requirement is not needed to protect shippers from the abuse of market power." "The purpose of this exemption

'is to provide through ... freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve facilities while achieving the financial stability of the national rail system.'" *Id.* (quoting H.R. Conf. Rep. No. 96–1430, 96th Cong. 2d Sess. 80, *reprinted in*, 1980 U.S. Code Cong. & Admin. News 3978, 4110, 4111).

Most importantly, the *Farley* Court emphasized that "[a]n exemption under § 10505 *does not leave a carrier entirely free from the provisions of the ICA*. Exempted carriers *remain subject* to ICC review in order to ensure that the exempted carriers comply with ICA policy." *Id.* (emphasis added). Indeed, "[u]nder § 10505(d), the ICC can revoke an exemption when it finds that application of a provision of the subtitle 'is necessary to carry out the transportation policy of section 10101(a).'" *Id.* Ultimately, the *Farley* Court concluded that "[g]iven the *experimental nature* of the exemption scheme and the revocability of exemptions it is difficult to believe Congress intended the exemptions to place carriers under a different set of federal regulations." *Id.* at 271-72. Hence, the *Farley* Court held that defendant Metro North Commuter R.R. was exempt under the FLSA because "Metro–North's § 10505 exemption from provisions of the ICA does not exclude them from all ICA provisions. Furthermore, the ICC can partially or completely revoke Metro–North's exemption *at any time* it finds it necessary to carry out railway policy." *Id.* at 272 (emphasis added).

Per the *Farley* decision, Plaintiffs are without any recourse here under the FLSA unless they can show *Farley* doesn't apply. As one may expect, Plaintiffs' Opp. at 14 argues that "*Farley* is no longer good law." *Id.* In support of this contention, Plaintiffs assert that, post-*Farley*, the Interstate Commerce Commission ("ICC") has been abolished and that under the new legislation, Defendants are not subject to the Surface Transportation Board's ("STB") jurisdiction regarding any issues here (i.e. the Board who replaced the ICC). Plaintiffs argue this means that Defendants

are now covered under the FLSA here. *See* Plaintiffs' Opp. at 14-15. Plaintiffs' arguments may be summarized as follows.

Plaintiffs first provide an overview of the FLSA and ICC and state that: "the FLSA, by reference to 49 U.S.C. §§ 10101 *et seq.*, does not exempt 'local government authorit[ies],' which federal law defines to include quasi-private entities like MTA, from coverage." *Id.* at 12-13 (citing 29 U.S.C. § 213(b)(2); 49 U.S.C. §§ 5302(11)(D), 10501(a)(1)). Plaintiffs' Opp. at 13 further notes that: "Section 213(b)(2) of title 29 exempts employees of 'a rail carrier subject to part A of subtitle IV of title 49, United States Code [49 U.S.C. §§ 10101 *et seq.*].'" The referenced statute codifies language from the Interstate Commerce Commission Termination Act ("ICCTA") of 1995, which abolished the Interstate Commerce Commission ("ICC") and transferred some of its duties to the Surface Transportation Board ("STB"). *See* 49 U.S.C. § 1301 *et seq.* (describing the establishment of the STB).

Plaintiffs then note that "[t]he provision cited in the FLSA includes sections describing the STB's jurisdiction." *Id.* at 13 (citing 49 U.S.C. §§ 10501-10502). Hence, Plaintiffs' core argument is that "if a rail carrier is subject to the STB's jurisdiction, it falls within the FLSA exemption. *MTA does not fall under the STB's jurisdiction, so its repeated statement that it is a 'rail carrier' subject to the exemption is wrong*." *Id.* This Court concludes that Plaintiffs' argument is unpersuasive and will review the pertinent provisions below in greater depth now, which support the Court's recommendation here in relation to *Farley*.

First, Plaintiff's Opp. at 13 correctly states that: "Section 10501 of title 49 defines the STB's jurisdiction over 'transportation by rail carrier.'" (quoting 49 U.S.C. § 10501(a)(1)). Second, Plaintiff is also correct that: "While STB has jurisdiction over transportation 'that is only by railroad,' or 'by railroad and water,' *id.*, it lacks jurisdiction over 'public transportation

26

provided by a local government[al] authority,' *id.* § 10501(c)(2)." With this framework in mind, Plaintiffs further assert that: "The 'local government authority' exemption added in 1995 expanded an earlier exemption in the ICC that only excluded a public carrier if, among other things, its fares were subject to approval or disapproval by the state's Governor." *See* Plaintiffs' Opp. at 14. Moreover, "The ICCTA version, in contrast, exempts all 'public transportation provided by a local government authority,' as defined, without condition." *Id.* (citing 49 U.S.C. § 10501(c)(2)). Hence, Plaintiffs' argument is that "*Farley* is no longer good law" since *Farley* predates the 1995 expanded exemption and "MTA cites *no post-ICCTA law* holding that MTA is subject to the STB's authority or exempt from FLSA compliance." *Id.* (emphasis added).

Glaringly however, Plaintiffs fail to mention that the relevant law central to the *Farley* Court's reasoning functionally mirrors the current law in providing that the STB may revoke a jurisdictional exemption "at any time." *Compare Farley*, 690 F. Supp. at 272 ("[T]he ICC can partially or completely revoke Metro–North's exemption *at any time* it finds it necessary to carry out railway policy. . .") (emphasis added); 49 U.S.C. § 10502(d) ("The Board *may revoke an exemption, to the extent it specifies*, when it finds that application in whole or in part of a provision of this part to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title.") (emphasis added).[11] In other words, the key issue is not whether STB exemption is broader now than an older version of the law pertaining to the ICC. Rather, the

---

[11]  The language quoted above from 49 U.S.C. § 10502(d) above is also not contradicted by the General Accounting Office's Report attached as Exhibit G to MTA's Reply [ECF 54-7], which Plaintiffs argue provides that: "'STB is statutorily prohibited from assuming jurisdiction over mass transportation provided by local government authorities,' except in certain circumstances that MTA does not argue are relevant to this case, such as when a commuter railroad enters into a contract with Amtrak." *See* Plaintiffs' Sur-Reply at 4-5. Again, the issue is not whether the STB *currently* is exercising jurisdiction over mass transportation provided by local government authorities. Rather, the issue, as articulated in *Farley*, is that the STB *may revoke* exemptions at any time and thereby subject the MTA to the jurisdiction of the STB if the STB so chooses. Thus, consistent with *Farley*, such a jurisdictional reach from the STB is sufficient to reach the conclusion here that the FLSA requirements do not apply to Defendants in this case regarding the instant Motion. Finally, this Court notes that Plaintiffs' Opp. at 13 cites 49 U.S.C. § 10502 in passing, but does not mention the exemption revocation language discussed above.

central question is whether the current STB, like the ICC, has the ability *when it chooses* to subject the MTA to its jurisdiction.[12]  Per the quoted language in 49 U.S.C. § 10502, the STB has this *same authority* in the current law analogous to the ICC, meaning the reasoning in *Farley* is still good law.  Finally, Defendants' Reply at 11 correctly notes that: "While Plaintiffs argue that *Farley* is no longer good law, they point to no authority for support. To the contrary, *Farley* is still good law: employees of the LIRR and MNR are exempt from overtime under the FLSA."  Indeed, this Court upon its own review of the case law has not found a *single instance* of another Court suggesting *Farley* is no longer good law since the establishment of the STB.[13]

Based upon the above reasons, this Court concludes that Plaintiffs' FLSA claims should be dismissed as well.[14]

## V.    CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss the Complaint in Part be granted.

---

[12] Relatedly, this Court notes that Plaintiffs' Sur-Reply at 5 does not change this analysis when Plaintiffs argue that: "Evidence that STB has twice issued a decision about an issue involving two miles of railroad track owned by MTA does not alter the rule that STB, as a general matter, lacks jurisdiction over 'local government authorities' like MTA." (citing Defendants' Reply Exs. E, F, ECF Nos. 54-5, 54-6).  Once again, per *Farley*, the key point is not whether the STB *has actually* exercised jurisdiction over the MTA in a certain capacity, but whether the STB has the *discretion* to expand jurisdiction over the MTA if the STB so chooses.  Finally, this Court also notes that Defendants' reliance on the case from the Second Department of the Appellate Division *Astro Ready Mix, LLC, et al. v. MTA Long Island Railroad*, provided in ECF 59, does not impact the analysis here either, which involved questions of preemption.  As already stated, the STB has the option to revoke exemptions "to the extent it specifies" (i.e. "at any time") as in *Farley*, which suffices to recommend granting Defendants' Motion here.

[13] To the extent Plaintiffs' Opp. at 15 argues that there is no FLSA exemption because: "the FLSA, by incorporating the ICCTA, 49 U.S.C. § 10501, uses a statutory definition of 'local governmental authority' that is different from the NYLL § 651(5)(m) term 'political subdivision,' as it has been interpreted by the New York Court of Appeals," this Court's discussion of *Farley* plus the current law in 49 U.S.C. § 10502(d) is not impacted by this point.

[14] This Court also agrees with Defendants' Reply. at 11 that Plaintiffs' Opp. at 12 n.4 is incorrect that: "To the extent that the exemption applies to any MTA employees, the extent to which it applies is a subject of discovery that cannot be decided at the motion to dismiss stage."  First, this Court notes that Plaintiffs cite nonbinding authority from outside jurisdictions for this proposition.  Second, and more problematically for Plaintiffs, Defendants' Reply at 12 correctly notes that: "Unlike many of the other exemptions under the FLSA, such as the administrative, executive or professional exemptions, the rail carrier exemption is an employer-based exemption, not employee-based. That is, the exemption does not depend on the type of work performed by the employee, but rather by the *status of the employer*." (emphasis added).  Indeed, recall that the plain text of 29 U.S.C. § 213 exempts: "*any employee* of an employer engaged in the operation of a rail carrier subject to [49 U.S.C. § 10101, *et seq.*]." (emphasis added).

## VI.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals.  *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


**SO ORDERED.**


 /s/ Steven Tiscione
Steven Tiscione
United States Magistrate Judge
Eastern District of New York


Dated: Central Islip, New York
February 26, 2024