UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

FILED
CLERK

9/19/2024 3:14 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

------------------------------------------------------------------------X
JAMIE GREENE, LAMELL ARMOR,
FABIAN SAUGAR, JOHN BRENNAN,
and ARTHUR BENNETT, on behalf of
themselves and all others similarly situated,

                                          Plaintiffs,

                    **MEMORANDUM & ORDER**
                    22-cv-3300 (JMA) (ST)

           -against-

METROPOLITAN TRANSPORTATION AUTHORITY,
LONG ISLAND RAILROAD, METRO-NORTH
RAILROAD, STATEN ISLAND RAILWAY, MTA
CONSTRUCTION AND DEVELOPMENT, MTA
REGIONAL BUS OPERATIONS, MTA BRIDGES
AND TUNNELS, and NEW YORK CITY TRANSIT
AUTHORITY,

                                          Defendants.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

       Plaintiffs Jamie Greene, Lamell Armor, Fabian Saugar, John Brennan, and Arthur Bennett,

on behalf of themselves and all others similarly situated ("Plaintiffs") sued Defendants

Metropolitan Transportation Authority, Long Island Railroad, Metro-North Railroad, Staten Island

Railway, MTA Construction And Development, MTA Regional Bus Operations, MTA Bridges

And Tunnels, and New York City Transit Authority ("Defendants" or "MTA") alleging—among

other things—delayed wage payments, overtime violations, and related damages under the Fair

Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").[1]  (See First Am. Compl.,

---

[1]     Plaintiffs Jamie Greene, Lamell Armor, Fabian Saugar, and John Brennan ("Railroad Worker Plaintiffs")
work for either the Long Island Railroad or Metro-North Railroad.  (ECF No. 46, at 1; see also ECF No. 24, at ¶¶ 11–
34.)  Plaintiff Arthur Bennett, who works for the Manhattan and Bronx Surface Transit Operating Authority
("MaBSTOA"), is not a "Railroad Worker Plaintiff."  (Id.; see also ECF No. 24, at ¶¶ 31–32.)

ECF No. 24.)  The Court presumes familiarity with the background of this case.

Presently before the Court is Defendants' Motion to Dismiss Plaintiff's First Amended Complaint in Part under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[2]  (ECF No. 45.)  In a Report and Recommendation issued on February 26, 2024 ("R&R"), United States Magistrate Judge Steven L. Tiscione recommended that (1) Plaintiffs' NYLL overtime and frequency of pay claims should be dismissed, and (2) Plaintiffs' FLSA claims against the Railroad Worker Plaintiffs should be dismissed as well.  (ECF No. 67.)  Defendants filed timely objections to the R&R, and Plaintiffs responded to those objections.  (ECF Nos. 68–69.)

On March 30, 2024, this Court (1) entered an order "adopt[ing] the R&R's analysis and recommendations as to the NYLL overtime claims and dismisse[d] those claims;" and noted that it would "address Plaintiffs' objections to the NYLL frequency of pay claims and the FLSA claims in a separate order."  (ECF No. 70, at 2.)  This is that separate order.

## I.        LEGAL STANDARD

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); see also FED. R. CIV. P. 72(b)(3); Grassia v. Scully, 892 F.2d 16, 19 (2d Cir. 1989).  When a party makes specific objections, the court reviews de novo those portions of the R&R to which objection is made.  See id.; see also FED. R. CIV. P. 72(b)(3); Kruger v. Virgin Atl. Airways, Ltd., 976 F. Supp. 2d 290,

___

[2] Plaintiffs allege four causes of action in their First Amended Complaint: (i) Fair Labor Standards Act: Late Payment—Brought by all Plaintiffs on behalf of the FLSA Kronos Collective, (First Am. Compl. ¶¶ 91–102, ECF No. 24); (ii) New York Labor Law: Late Payment—Brought by all Plaintiffs on behalf of the New York Late Payment Class, (id. at ¶¶ 103–110); (iii) Fair Labor Standards Act: Overtime Rate—Brought on behalf of Plaintiffs Greene, Armor, Saugar, and Brennan ("Railroad Worker Plaintiffs") on behalf of the FLSA Shift Differential Collective, (id. at ¶¶ 111–122); and (iv) New York Labor Law: Overtime Rate—Brought on behalf the Railroad Worker Plaintiffs and the New York Shift Differential Collective, (id. at ¶¶ 123–130).  In the instant motion, Defendants move to dismiss the entirety of Plaintiffs' second, third, and fourth causes of action.  Defendants do not, however, move to dismiss the first cause of action as to all Plaintiffs.  (R&R at 22, n.10, ECF No. 67.)  Defendants only move to dismiss the FLSA late payment claims brought by the "Railroad Worker Plaintiffs."  (Id.)

296 (E.D.N.Y. 2013) ("A proper objection is one that identifies the specific portions of the R&R that the objector asserts are erroneous and provides a basis for this assertion."), aff'd, 578 F. App'x 51 (2d Cir. 2014).  But where "a party makes only conclusory or general objections, or simply reiterates the original arguments," the court reviews the R&R "strictly for clear error."  See Washington v. Gilman Mgmt. Corp., 2023 WL 6211022, at *3 (E.D.N.Y. Sept. 25, 2023); see also Thomas v. City of N.Y., 2019 WL 3491486, at *4 (E.D.N.Y. Jul. 31, 2019) (same).

To accept those portions of an R&R "to which no timely objection has been made," however, "a district court need only satisfy itself that there is no clear error on the face of the record."  Lorick, 2022 WL 1104849, at *2 (quoting Ruiz v. Citibank, N.A., 2014 WL 4635575, at *2 (S.D.N.Y. Aug. 19, 2014)); see also Jarvis v. N. Am. Globex Fund, L.P., 823 F. Supp. 2d 161, 163 (E.D.N.Y. 2011).  Clear error will be found only when, upon review of the entire record, the Court is "left with the definite and firm conviction that a mistake has been committed."  United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quoting United States v. Garcia, 413 F.3d 201, 222 (2d Cir. 2005)).

Additionally, to survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  Twombly, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff."  Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however,

3

does not apply to legal conclusions.  See Iqbal, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.  Moreover, in analyzing a motion to dismiss under Rule 12(b)(6), the Court is limited to the "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference" or "matters of which judicial notice may be taken."  Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

## II.    DISCUSSION

Applying de novo review to portions of the R&R to which Plaintiffs objected, the Court adopts the R&R in part and respectfully overrules it in part with respect to Plaintiffs' claims.

## A.    Defendants' Second Objection: Plaintiffs' NYLL Frequency of Pay Claims

The R&R recommends the Court grant Defendants' motion to dismiss Plaintiffs' NYLL § 191 frequency of pay claims.  (See R&R at 17–21, ECF No. 67.)  The R&R concluded that Defendants are exempt from NYLL § 191(1)(b)'s frequency of pay provisions because the MTA and its subsidiaries constitute a "governmental agency" under NYLL § 190(3).  (See id. at 21.) Plaintiffs object to this conclusion, arguing that the MTA and its subsidiaries are non-exempt "employers" under NYLL § 190(3), and thus must comply with NYLL § 191(1)(b).  (See Pls.' Obj. at 3–4, ECF No. 68.)  For the below reasons, the Court adopts the R&R's recommendation to grant Defendants' motion to dismiss Plaintiffs' NYLL frequency of pay claims.

### 1.    Applicable Law

Article 6 of the NYLL—New York State's wage theft statute—sets forth various requirements relating to an employer's pay practices.  See N.Y. Lab. Law §§ 190 et seq.  Two provisions contained therein are at the heart of this dispute.

NYLL § 190(3) broadly defines the types of "employer[s]" that are subject to the NYLL's

frequency of pay provisions: "'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." Id. NYLL § 190(3) does, however, exempt governmental agencies from the NYLL's coverage. (See id.) The statute reads in full:

> "'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service. The term 'employer' shall not include a governmental agency."

Id. (emphasis added).

NYLL § 191 outlines the frequency by which "every employer"—as defined by NYLL § 190(3)—must pay certain categories of employees. N.Y. Lab. Law § 191(1). Section 191 applies only to "employers," not governmental agencies. Id. As applicable here, qualifying "employers" must pay railroad workers each week and comply with certain mailing requirements:

> "A railroad worker shall be paid on or before Thursday of each week the wages earned during the seven-day period ending on Tuesday of the preceding week; and provided further that at the written request and notification of address by any employee, every railroad corporation, with the exception of those commuter railroads under the jurisdiction of the metropolitan transportation authority, shall mail every check for wages of such employee via the United States postal service, first class mail."

N.Y. Lab. Law § 191(1)(b) (emphasis added).

The statutory history of both provisions is particularly relevant here.

NYLL § 190 was enacted in 1966. See N.Y. Lab. Law § 190, as added by L. 1966, ch. 548, § 2. At the time of its enactment in 1966, NYLL § 190(3)'s definition of "employer" and its exclusion of "governmental agenc[ies]" therefrom read: "'Employer' includes any person, corporation or association employing any individual in any occupation, industry, trade, business or service. The term 'employer' shall not include a governmental agency." Id. § 190(3). Although NYLL § 190 has been amended eight times since its enactment in 1966, NYLL § 190(3)'s

definition of "employer" has only undergone one change.  In 2002, the New York State legislature amended NYLL § 190(3)'s definition of "employer" to include "limited liability company."  N.Y. Lab. Law § 190(3), as amended by L. 2002, ch. 281, § 1, eff. Aug. 6, 2002.  NYLL § 190(3)'s exclusion of "governmental agenc[ies]" from its definition of "employer," however, has never been amended in any way.

NYLL § 191(1)(b) was also enacted in 1966.  See N.Y. Lab. Law § 191, as added by L. 1966, ch. 548, § 2.  Prior to its 1987 amendment, NYLL § 191(1)(b) simply required railroad workers to be paid—on or before Thursday of each week—the wages earned in the preceding week.  See id.  In 1987, however, the New York State legislature amended NYLL § 191(1)(b) to include a mailing requirement for qualifying employers, adding the phrase: "and provided further that at the written request and notification of address by any employee, every railroad corporation, with the exception of those commuter railroads under the jurisdiction of the metropolitan transportation authority, shall mail every check for wages of such employee via the United States postal service, first class mail."  N.Y. Lab. Law § 191, as amended by L. 1987, ch. 404, § 1.

## 2.     Analysis

The critical question presented is whether the MTA (together with its subsidiaries) qualifies as an exempt "governmental agency" or a non-exempt "employer" under Article 6 the NYLL.[3] The R&R recommended that this Court dismiss Plaintiffs' NYLL frequency of pay claims because the MTA (and by extension, its subsidiaries) is an exempt governmental agency "as a matter of plain text" under NYLL § 190(3).  (See R&R at 21, ECF No. 67.)  The Court agrees and adopts the R&R's recommendation.

---

[3]     If Defendants qualify as an exempt "governmental agency," Plaintiffs' frequency of pay claims must be dismissed under Article 6 of the NYLL as a matter of law.  See N.Y. Lab. Law § 190(3).  But Plaintiffs claims may proceed if the Court determines Defendants qualify as non-exempt "employers" under § 190(3).  See id.

"Where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used." Patrolmen's Benev. Ass'n of City of New York v. City of New York, 41 N.Y.2d 205, 208 (1976).  And when a term is not defined by statute, courts may "look to its ordinary meaning found in contemporary dictionary definitions," that is, in dictionaries that were available when the statute was enacted. Mader v. Experian Info. Sols., Inc., 56 F.4th 264, 269 (2d Cir. 2023) (citation omitted); see also Walsh v. New York State Comptroller, 34 N.Y.3d 520, 524 (2019) ("In the absence of a statutory definition, [courts] construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase.")).  Black's Law Dictionary defines "governmental agency" at the time of the bill's passage as "[a] subordinate creature of the sovereign created to carry out a governmental function.  [It is] frequently, a political subdivision or corporation." Governmental Agency, Black's Law Dictionary (4th ed. 1968) (emphasis added).   The MTA and its subsidiaries fall within this definition, and the only other court to consider the issue found that the MTA qualifies as a governmental agency.[4] See D'Antonio v. Metropolitan Transp. Authority, 2008 WL 582354, at *5 (S.D.N.Y. Mar. 4, 2008).  Plaintiffs offer no authority to the contrary, and this Court is unable to locate any.[5]  (See R&R at 18–19, ECF No. 67; see also (Defs.' Resp. at 3, ECF No. 69).)

---

[4]     Plaintiffs argue that this Court should not rely on D'Antonio because, according to Plaintiffs, that court did not fully grapple with the question of whether the MTA qualifies as an exempt governmental agency under NYLL § 190(3).  Plaintiffs also maintain that the cases Judge Wood cited in D'Antonio do not support her interpretation of NYLL § 190(3).  To be sure, this Court recognizes that the D'Antonio court held that the MTA and NYCTA both qualified as exempt governmental agencies, and therefore do not fall under the terms of § 190(3), only after noting that the plaintiff did "not offer contrary authority or even respond to the MTA and NYCTA's argument" that they so qualified.  D'Antonio, 2008 WL 582354, at *5.  Moreover, the Court also agrees that the cases Judge Wood cited in D'Antonio appear to have little relevance to the question of how to interpret NYLL § 190(3) as applied to the MTA.  Nevertheless, considering the Court's textual, statutory history, and legislative history analyses below, it still agrees with the D'Antonio court's ultimate conclusion.

[5]     Notably, courts have also broadly construed "governmental agency" to include counties, municipalities, and towns.  See Arciello v. Cnty. of Nassau, 2019 WL 4575145, at *8 (E.D.N.Y. Sept. 20, 2019).

Accordingly, the Court agrees with the R&R's conclusion that the MTA (and by extension, its subsidiaries) is an exempt governmental agency "as a matter of plain text" under NYLL § 190(3). (See R&R at 21, ECF No. 67.)

To support their argument that the MTA is a non-exempt "employer" under Article 6, Plaintiffs argue that the R&R improperly ignored the text of NYLL § 191(1)(b)—which Plaintiffs contend has a clear textual implication: the "MTA is a 'railroad corporation,' not a governmental agency."[6]  (See Pls.' Obj. at 3–4, ECF No. 68.)  Practically speaking, Plaintiffs' argument is as follows: the mentioning of the MTA in § 191(1)(b)—which exempts the MTA from certain mailing requirements—implies that the MTA is an "employer" and thus must be subject to the remaining provisions of Article 6 of the NYLL.  (See id.; see also R&R at 21.)  But nothing in § 191(1)(b)'s text says (or even implies) that § 191(1)(b) should be read so broadly.  Section 191 only applies to qualifying "employers" as defined by § 190(3).  N.Y. Lab. Law § 191(1).  Section 191 does not, however, apply to a "governmental agency" that is exempted from the definition of "employer."[7]  N.Y. Lab. Law § 190(3).  Because the Court agrees that the plain text of Article 6

---

[6]    See, e.g., N.Y. Lab. Law § 191(1)(b) ("A railroad worker shall be paid on or before Thursday of each week the wages earned during the seven-day period ending on Tuesday of the preceding week; and provided further that at the written request and notification of address by any employee, every railroad corporation, with the exception of those commuter railroads under the jurisdiction of the metropolitan transportation authority, shall mail every check for wages of such employee via the United States postal service, first class mail.") (emphasis added).

[7]    In passing, Plaintiffs suggest that the R&R's interpretation of NYLL § 191(1)(b) renders the MTA's reference "superfluous."  (See Pls.' Obj. at 6, ECF No. 68.)  But even assuming arguendo that Plaintiffs are right, this Court's "preference for avoiding surplusage constructions is not absolute."  Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004); see also Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013).  And that preference does not control here.  In Barton v. Barr, the Supreme Court acknowledged that its interpretation of one immigration statutory provision rendered another provision superfluous.  590 U.S. 222, 239 (2020).  Nonetheless, it explained that "redundancies are common in statutory drafting" and that "[s]ometimes the better overall reading of the statute contains some redundancy."  Id.; see also Rimini Street, Inc. v. Oracle USA, Inc., 586 U.S. 334, 346 (2019).  Thus, the Supreme Court ultimately held that "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text."  Barton, 590 U.S. at 239.  So too here, Plaintiffs' proposed interpretation would have this Court rewrite NYLL § 190(3) to say something it does not.  The Court may not do so, (alleged) surplusage notwithstanding.  See Lamie, 540 U.S. at 534–37; see also Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC, 556 F.3d 690, 695 (8th Cir. 2009) ("[S]urplusage[ ] does not warrant rewriting the text of a statute whose meaning is plain and produces no absurd results.").

governs this dispute and concludes that the MTA and its subsidiaries qualify as exempt governmental agencies, its analysis can end there.  See Nat. Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 127 (2018) (holding that where statutory text is "unambiguous, [the Court's] inquiry begins with the statutory text, and ends there as well") (internal quotation marks omitted); see also Columbia Mem. Hosp. v. Hinds, 38 N.Y.3d 253, 271 (2022) (holding courts "begin and end" statutory interpretation analyses with statutory text because "'the statutory text is the clearest indicator of legislative intent' and … a court 'should construe unambiguous language to give effect to its plain meaning") (quoting Matter of DaimlerChrysler Corp. v. Spitzer, 7 N.Y.3d 653, 660 (2006))).

Even if the Court looked beyond the NYLL's unambiguous statutory text, its statutory history further supports the above textual conclusion.  See United States v. Dai, 99 F.4th 136, 139 (2d Cir. 2024) (examining "statutory history" to solve statutory interpretation question under federal law); see also Konkur v. Utica Academy of Science Charter School, 38 N.Y.3d 38, 42 (2022) (examining "statutory history" to solve statutory interpretation question under New York law).  The New York State legislature had multiple opportunities to write the limitation on the scope of exempt governmental agencies Plaintiffs would have this Court impose.  But it never did.

NYLL § 190(3)'s definition of "employer" and its exclusion of "governmental agenc[ies]" therefrom was enacted in 1966, twenty-one years before the New York State legislature amended NYLL § 191(1)(b) to include a mailing requirement and a reference to the MTA.  Compare N.Y. Lab. Law § 190(3), as added by L. 1966, ch. 548, § 2, with N.Y. Lab. Law § 191, as amended by L. 1987, ch. 404, § 1.  Between 1966 and 1987, the New York State legislature amended NYLL § 190 three times.[8]  Not once did it alter § 190(3)'s definition of "employer" or the scope of

---

[8]     See N.Y. Lab. Law § 190, as amended by L. 1972, ch. 328, § 1; see also N.Y. Lab. Law § 190, as amended by L. 1976, ch. 288, § 1; N.Y. Lab. Law § 190, as amended by L. 1984, ch. 496, § 1.

"governmental agenc[ies]" exempt from the NYLL's frequency of pay provisions.  In 1987, the

New York State legislature mentioned MTA as explicitly exempt from NYLL § 191(1)(b)'s newly

imposed mailing requirements.  See N.Y. Lab. Law § 191, as amended by L. 1987, ch. 404, § 1.

But the legislature's reference to the MTA in 1987 did nothing to narrow the scope of exempt

"governmental agenc[ies]" under NYLL § 190(3).  Indeed, since NYLL § 191(1)(b)'s 1987

amendment, the New York State legislature amended NYLL § 190 five more times.[9]  In each

instance, the legislature never amended—in any way—the scope of "governmental agenc[ies]"

exempt from the NYLL's frequency of pay provisions.[10]  Accordingly, the NYLL's statutory

history shows that the New York State legislature did not alter NYLL § 190(3)'s "governmental

agency" exemption by implication through the language NYLL § 191(1)(b).  To hold otherwise

would alter 58 years of established New York law without so much as a whisper from the state's

lawmakers.

Even if the NYLL's statutory text or statutory history were ambiguous, which they aren't,

the statute's legislative history confirms that the MTA (together with its subsidiaries) was and is

an exempt "governmental agency" under the NYLL.  See Spadaro v. U.S. Customs & Border Prot.,

978 F.3d 34, 46 (2d Cir. 2020) (citation omitted) ("When interpreting a statute, [courts] begin with

the plain language of the statute, giving the statutory terms their ordinary or natural meaning....

When that meaning is not clear, [courts] make use of a variety of interpretive tools, including

canons, statutory structure, and legislative history."); see also Anonymous v. Molik, 32 N.Y.3d

30, 37 (2018) ("Where the [statutory] language is ambiguous … courts may resort to legislative

---

[9]      See N.Y. Lab. Law § 190, as amended by L. 1992, ch. 165, § 1; see also N.Y. Lab. Law § 190, as amended
by L. 2002, ch. 281, § 1, eff. Aug. 6, 2002; N.Y. Lab. Law § 190, as amended by L. 2007, ch. 304, § 1, eff. Jan. 14,
2008; N.Y. Lab. Law § 190, as amended by L. 2023, ch. 433, § 1, eff. Mar. 13, 2024.

[10]     In 2002, the New York State legislature amended the NYLL § 190(3)'s definition of "employer" to include
"limited liability company."  N.Y. Lab. Law § 190(3), as amended by L. 2002, ch. 281, § 1, eff. Aug. 6, 2002.

history.") (cleaned up)).

During the legislative proceedings leading up to the voting on (and ultimate passage of) NYLL § 191(1)(b)'s 1987 amendment, various state agencies submitted letters setting forth their respective positions on the proposed amendment.  Those letters confirm that the MTA was not to be included—for the first time—in the definition of "employer" under Article 6.  For example, in a letter dated July 3, 1987, the New York Department of Labor ("NYSDOL") indicated that it did not object to the inclusion of the language at NYLL § 191(1)(b), which exempted the MTA from the mailing requirements of other railroad corporations.  See Bill Jacket, L.1987, ch. 404, § 1, at 16.  Crucially, the letter stated: "It should be noted that the Department [of Labor] has traditionally taken the position that [employees of the MTA] are employees of a governmental agency and are not, therefore, subject to the requirements of section 191 of the [NYLL]."[11]  Id.; see also Defs.' Ex. A, ECF No. 54-1 ("NYSDOL 1987 Letter").  Further bolstering the legislative understanding that the MTA was never intended to be covered by the NYLL's frequency of pay provisions, the Governor's Office of Employee Relations wrote a letter expressing no objection to the NYLL § 191 amendment in 1987 because "[i]t is apparent that this bill will have no impact upon public sector employees employed in New York State …."  Id. at 17; see also Defs.' Ex. C, ECF No. 54-3 ("GOER Memo").  It is clear from this letter that the Governor's Office of Employee Relations ("GOER") did not believe that the legislature intended to expand the definition of "employer" to include the MTA through this amendment.  If it had, it is hard to imagine how such a sea change

---

[11]    Likewise, in 1993, the NYSDOL issued a letter to the Vice President of Labor Relations for the LIRR confirming that subsidiaries of the MTA are governmental agencies excluded from NYLL § 193 based on the definition of employer contained in NYLL § 190(3).  (See Defs.' Ex. A, ECF No. 69-1 ("NYSDOL 1993 Letter").)  The NYSDOL issued similar opinion letters, which came to the same conclusion, in 1983 and 1995.  (See Defs.' Ex. B, ECF No. 54-2 ("NYSDOL 1983 Memo and 1995 Letter") (both holding that Metro-North was exempt from Article 6 of the NYLL).)  Although these NYSDOL opinion letters are not legislative history, the Court considers such post-enactment interpretations to be persuasive authority.

in the law would "have no impact upon public sector employees employed in New York State." Bill Jacket, L.1987, ch. 404, § 1, at 17.  Consistent with GOER's view that there would be no impact on public sector employers, the MTA submitted a letter advising that it had "no objections to this legislation." Id. at 11; see also Defs.' Ex. D, ECF No. 54-4 ("MTA Memo").  Again, consistent with GOER's view, the Division of Budget found that the amendment had "no appreciable effect on State finances or programs."  Id. at 14; see also ECF No. 53 at 4.

For the above reasons, the Court adopts the R&R's recommendation to dismiss Plaintiffs' NYLL frequency of pay claim because the MTA (together with its subsidiaries) is a "government agency" and does not qualify as an "employer" under NYLL § 190(3).

**B.    Defendants' Third Objection: Railroad Worker Plaintiffs' FLSA Claims**

The R&R also recommends the Court grant Defendants' motion to dismiss the Railroad Worker Plaintiffs' FLSA claims.[12]  (See R&R at 22–28, ECF No. 67.)  The R&R first concludes that the MTA is a rail carrier exempt from the FLSA's maximum hour provisions under Farley v. Metro North Commuter Railroad, 690 F. Supp. 268, 269 (S.D.N.Y. 1988), aff'd, 865 F.2d 33 (2d Cir. 1989).  (See id. at 22.)  The R&R then concludes that the statutory amendments enacted after Farley do not impact this conclusion.  (See id.)

Plaintiffs loft three objections in response.  First, they argue that Farley does not apply because it applies statutory text that has been amended by the ICCTA—which, as explained below, abolished the Interstate Commerce Commission ("ICC"), and transferred some of its duties to the

---

[12]       As mentioned, Plaintiffs' FLSA claims include: (First Cause of Action) Fair Labor Standards Act: Late Payment—Brought by all Plaintiffs on behalf of the FLSA Kronos Collective, (First Am. Compl. ¶¶ 91–102, ECF No. 24); and (Third Cause of Action) Fair Labor Standards Act: Overtime Rate—Brought on behalf of Plaintiffs Greene, Armor, Saugar, and Brennan ("Railroad Worker Plaintiffs") on behalf of the FLSA Shift Differential Collective, (id. at ¶¶ 111–122).  Here, Defendants move to dismiss the entirety of Plaintiffs' third cause of action under the FLSA. Defendants do not, however, move to dismiss the first cause of action as to all Plaintiffs.  (R&R at 22, n.10, ECF No. 67.)  Defendants only move to dismiss the FLSA late payment claims brought by the "Railroad Worker Plaintiffs." (Id.)

Surface Transportation Board ("STB").  (See Pls.' Obj. at 11, ECF No. 68.)  Second, Plaintiffs argue that, under the current version of the FLSA, the MTA is not subject to the STB's jurisdiction and is therefore not an exempt rail carrier under 29 U.S.C. § 213(b)(2).  (See id. at 13.)  Finally, and in the alternative, Plaintiffs argue that whether the STB has jurisdiction over the MTA is a factual question that the Court cannot resolve at the motion to dismiss stage.  (See id. at 14.)

For the below reasons, the Court respectfully overrules the R&R's recommendation to grant Defendants' motion to dismiss the Railroad Worker Plaintiffs' FLSA claims.

**1.    Relevant Statutory Provisions and Caselaw**

The issues presented here involve the confluence of several federal statutory schemes.

**a.    *FLSA Rail Carrier Exemption.***

The FLSA, 29 U.S.C. §§ 201–219, generally requires payment of overtime after forty hours of work per week.  29 U.S.C. § 207(a)(1).  At the time the Second Circuit decided Farley v. Metro North Commuter Railroad, 865 F.2d 33 (2d Cir. 1989), Section 13(b)(2) of the FLSA exempted "an employer engaged in the operation of a common carrier by rail and subject to the provisions of part 1 of the Interstate Commerce Act." 29 U.S.C. § 213(b)(2) (1982) (emphasis added).  This statutory language, however, has been amended over time.  Today, the FLSA's rail carrier exemption applies to "any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of Title 49," or in other words, the ICC Termination Act of 1995 ("ICCTA").  29 U.S.C. § 213(b)(2) (2018) (emphasis added).

It is well-settled that "an employer bears the burden of proving that its employees fall within an exempted category of the [FLSA]."  Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991); see also Corning Glass Works v. Brennan, 417 U.S. 188, 196–97 (1974).

To understand the Court's below conclusion to overrule the R&R's recommendation to

dismiss the Railroad Worker Plaintiffs' FLSA claims, it is necessary to explain how the FLSA's

rail carrier exemption relates to the different railroad regulations in existence pre-and-post-<u>Farley</u>.

    b.  *Statutory Landscape Pre-<u>Farley</u>.*

   Congress has exercised regulatory authority over rail transportation for over 137 years.  In

1887, Congress passed the Interstate Commerce Act ("ICA") and created an executive branch

body—the Interstate Commerce Commission ("ICC")—for two main purposes: (i) to supervise,

investigate, and regulate interstate carriers; and (ii) to determine whether any unjust discrimination

exists against interstate commerce.  <u>See, e.g.</u>, <u>U.S. v. Chicago Heights Trucking Co.</u>, 310 U.S. 344

(1940).  Over the years, the ICC's mandate broadened to cover several forms of interstate

transportation including—as relevant here—interstate railroads.

   In 1937, no federal legislation protected industrial and agricultural workers from

exploitation, so Congress enacted the FLSA to establish a minimum wage for employees engaged

in interstate commerce.  <u>See</u> <u>Farley</u>, 690 F. Supp. at 270.  In Section 7 of the FLSA, Congress

provided for a maximum work week of 40 hours and guaranteed time and one half for all work

done more than 40 hours.  <u>See</u> <u>id.</u>  The two-fold purpose of this overtime requirement was to "place

financial pressure on employers to hire more workers and to compensate employees for the burden

of working overtime."  <u>Id.</u> (citing <u>Donovan v. Brown</u>, 666 F.2d 148, 152 (5th Cir. 1982)).

   In drafting the FLSA, however, Congress recognized that certain employees did not need

the protection.  Accordingly, Section 13 of the FLSA exempted certain employers from the

requirements of Section 7, including in § 13(b)(2), "an employer engaged in the operation of a

common carrier by rail and subject to the provisions of part 1 of the Interstate Commerce Act."

29 U.S.C. § 213(b)(2) (1982).  These exemptions were designed to keep the FLSA from interfering

in industries already subject to federal regulations:

> "[I]t was the policy of the committee, in cases where regulation of hours and wages are given to other government agencies, to write the bill in such a way as not to conflict with such regulation ... It was taken with reference to railroad workers insofar as they were governed by the Hours of Service Act ... [I]t is my belief that it would certainly be unwise to have the hours of service regulated by two governmental agencies. I am further of the opinion that the Interstate Commerce Commission, since it has the power and has exercised it, should be the agency to be entrusted with this duty."

81 Cong. Rec. 7875 (daily ed. July 30, 1937) (Statement of Sen. Black).

At the time of the FLSA's enactment, there had been no federal regulation specifically regulating the <u>wages</u> of railroad employees.  See <u>Farley</u>, 690 F. Supp. at 270.  But Congress had addressed railroad labor matters in a series of acts since 1887, which, along with the development of labor unions, protected the rights and interests of railroad employees.  See <u>id.</u> at n.4 (collecting federal statutes already regulating railroads).  As a result, Congress saw no need to keep protecting these railroad employees by "including them within the purview of the FLSA."  <u>Id.</u>

When the FLSA's rail carrier exemption was drafted in 1937, all interstate railroads were subject to the ICA.  See <u>id.</u> at 271.  But at that time, Congress could not have foreseen the great increase in state railroad regulation and the railroads' subsequent loss of competitiveness that would occur over the next few decades.[13]  See <u>id.</u>  Seeking a comprehensive remedy for "an outmoded regulatory system" and "inadequate financial resources to improve and modernize rail facilities," S. Rep. No. 499 at 1, <u>reprinted in</u> 1976 U.S. Code Cong. & Admin. News at 15, Congress began purposeful deregulation by passing the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act").  <u>Farley</u>, 865 F.2d at 35.  But the railroad reinvigoration process was slow.  See <u>id.</u>  So, in 1980, Congress enacted the Staggers Rail Act, which has been

---

[13]     In the decade after 1967, "the growing capital shortfall in the American railroad industry culminated with a rash of bankruptcies." <u>Farley</u>, 865 F.2d at 35.  By late 1975, when Congress first addressed the situation, "eight major carriers in the Northeast and Midwest were in financial ruin." <u>Id.</u> (citing S. Rep. No. 499, 94th Cong., 2d Sess. 3 (1975), <u>reprinted in</u> 1976 U.S. Code Cong. & Admin. News 14, 17).

characterized as "the sharpest shift in federal regulatory law covering rail transportation since the Interstate Commerce Act of 1887." Id. at 35–36 (quoting T. Keeler, RAILROADS, FREIGHT, AND PUBLIC POLICY 102 (1983)); see also H.R. Conf. Rep. No. 1430, 96th Cong., 2d Sess. 79, reprinted in 1980 U.S. Code Cong. & Admin. News 4110, 4110–11. Through the Staggers Rail Act of 1980, Congress permitted deregulation to revitalize "the financial stability of the national rail system." Id. at 34 (quoting H.R. Conf. Rep. No. 96-1430, 96th Cong. 2d Sess. 80, reprinted in 1980 U.S. Code Cong. & Admin. News 3978, 4110–111).

The Staggers Rail Act allowed the ICC to exempt railroads from certain ICA regulations so long as they were "not necessary to carry out the [national] transportation policy." 49 U.S.C. § 10505(a)(1) (1982). The purpose of these § 10505 exemptions was, as mentioned, "to facilitate competition by substituting market-based decisions for superfluous regulatory structures." Farley, 865 F.2d at 36 (citing Note, Fine-Tuning Deregulation: The Interstate Commerce Commission's Use of its General Rail-Exemption Power, 53 GEO. WASH. L. REV. 827 (1985)). An exemption under § 10505, however, did not leave a rail carrier entirely free from the provisions of the ICA. See Farley, 690 F. Supp. at 271. Exempted rail carriers remained subject to ICC review to ensure that the exempted carriers complied with ICA policy. See id. For example, under § 10505(d), the ICC could revoke an exemption when it found that application of a provision of the subtitle was "necessary to carry out the transportation policy of section 10101(a)."[14]

---

[14] The legislative history of the Staggers Rail Act notes that "[t]he scope of regulatory authority over railroads by the commission continues to be all inclusive." H.R. Rep. No. 96–1035, 96th Cong., 2d Sess. 86, reprinted in 1980 U.S. Code Cong. & Admin. News 3978, 4030. And this idea was bolstered in Consolidated Rail Corporation—Declaratory Order–Exemption, 1 I.C.C. Rep. 895 (Feb. 27, 1986) (order 40045), in which the ICC decided that an exemption issued pursuant to § 10505 did not extinguish the ICC's jurisdiction:

"The revocation power is one of the central features of section 10505. It ensures the usefulness of the exemption process as a means of testing and determining the appropriate bounds of regulation in a changing transportation environment without the need for continual congressional attention. Congress envisioned exemptions as an experimental process."

     c.    *The <u>Farley</u> Decision*.

It was against this regulatory backdrop that the Second Circuit decided <u>Farley v. Metro</u> <u>North Commuter Railroad</u>, 865 F.2d 33 (2d Cir. 1989).  In that case, Metro-North Commuter Railroad employees sought to recover unpaid overtime compensation allegedly owed to them under the FLSA.  <u>See</u> <u>Farley</u>, 865 F.2d at 34.  At that time, the FLSA had exempted from coverage "any employee of an employer engaged in the operation of a common carrier by rail and <u>subject</u> <u>to the provisions of part I of the Interstate Commerce Act</u>."  29 U.S.C. § 213(b)(2) (1982) (emphasis added).  By 1989, Part I of the old ICA had been subsumed under Subtitle IV of the revised ICA, and the appellee (Metro–North) received a § 10505 exemption from ICA regulations in November 1982.  <u>See</u> <u>Farley</u>, 865 F.2d at 34.  So the question presented to the Court was whether the ICC exemption from Subtitle IV of the ICA received by Metro–North rendered it no longer "subject to the provisions . . . of the [ICA]" as stated in Section 13(b)(2).  <u>See id.</u> at 35.

Appellants argued that Section 13 is unambiguous: upon receiving the ICA § 10505 exemption, Metro-North no longer fell within the purview of § 13(b)(2) of the FLSA (the rail carrier exemption) and thus became obligated to comply with the Act's maximum hour requirements.  <u>See id.</u>  Put another way, Appellants argued that "subject to the provisions … of the [ICA]" meant subject to <u>all</u> its provisions.  <u>See id.</u> ("[A] railroad is either 'subject to the provisions ... of the [ICA]' or it is not.  If it is, then FLSA overtime provisions do not apply.  If it is not, then they do.").

   Metro-North countered that despite the administrative exemption granted by the ICC, Metro–North remained "subject to the provisions … of the [ICA]" and therefore remained exempted from the FLSA under § 13(b)(2).  <u>See id.</u>  Specifically, Metro-North contended that

---

<u>Id.</u> at 899; <u>see also</u> <u>Farley</u>, 690 F. Supp. at 271.

"subject to the provisions … of the [ICA]" meant subject to <u>some</u> of its provisions.  <u>Id.</u>

Judge Kaufman did not believe it was evident—from the face of the statute—whether the phrase "subject to the provisions ... of the [ICA]" referred to some or all of the ICA.  <u>Id.</u>  Because the statute's language did not unambiguously support either parties' position, Judge Kaufman investigated the legislative history of the FLSA § 13(b)(2) exemption and the ICA § 10505 exemption.  <u>See id.</u>

As for Section 13 of the FLSA, Judge Kaufman noted that the exemptions were designed to keep the FLSA from interfering in industries already subject to federal regulations.  <u>See id.</u> at 36.  Moreover, Judge Kaufman acknowledged that the 75th Congress could not have foreseen the rise in state railroad regulation, the railroads' subsequent loss of competitiveness, and the corresponding need for deregulation.  <u>See id.</u> at 35.  As a result, Judge Kaufman concluded that the Appellants' reading of § 13(b)(2) was contrary to Congress's intent:

> "[The 4-R Act and the Staggers Act] seek to deregulate the railroad industry. The Fair Labor Standards Act, however, governs the wages and hours of employees in interstate commerce except, among others, those in the railroad industry.  The legislative history of the section 13 exemption indicates that Congress intended to preserve this distinction.  To hold otherwise would alter 100 years of established Congressional policy without so much as a whisper from the nation's law-makers. It is inconceivable that a statute designed to deregulate must be read to re-regulate a distressed industry in this fashion."

<u>Id.</u> at 36.  At bottom, Judge Kaufman agreed with the district court's conclusion that "[t]he language of 13(b)(2) was not meant to subject deregulated railroads to other statutory provisions, but to encompass the scope of the ICC's jurisdiction without entering into the complications of defining that scope." <u>Id.</u>  at 34.

As for the 49 U.S.C. § 10505 exemption, Appellants claimed that application of the FLSA to railroads exempted under § 10505 adhered to the language and purpose of such exemptions.

See id. at 36.  Judge Kaufman disagreed, concluding that Appellants' interpretation would indeed undermine the exemption's terms.  See id. at 36–37.  Given the experimental nature of the § 10505 exemption scheme and the fact that the ICC could partially or completely revoke Metro–North's exemption at any time it found it necessary to carry out railway policy, see 49 U.S.C. § 10505(d), Judge Kaufman found it difficult to believe that Congress intended the exemptions to place carriers under a different set of federal regulations like the FLSA.[15]  See id.  So at bottom, Judge Kaufman concluded that the purpose of the § 10505 exemption was to free railroads from regulations, not subject them to different regulations that did not previously apply.  See id.

Judge Kaufman therefore held that, despite its § 10505 exemption, Metro-North remained "subject to the provisions … of the [ICA]" as stated in Section 13(b)(2) of the FLSA.  See id. Accordingly, he concluded Metro-North was exempt from the requirements of FLSA § 7.  See id.

    d.    *Statutory Landscape Post-Farley.*

Since Farley was decided, the relevant law has changed meaningfully.  As mentioned above, in 1980, Congress began the substantial economic deregulation of the surface transportation industry and, as a result, the downsizing of the ICC.  On December 29, 1995—about six years after the Second Circuit decided Farley—Congress passed the ICC Termination Act of 1995 ("ICCTA").  Pub. L. No. 104-88, 109 Stat. 803 (Dec. 29, 1995).  Effective January 1, 1996, the ICCTA abolished the ICC and created a new Surface Transportation Board ("STB") to regulate, among other things, rail transportation in the United States.  See id. (codified generally at 49 U.S.C.

---

[15]    Specifically, Judge Kaufman stated: "Regardless of the breadth of the Metro-North exemption, the ICC retains jurisdiction over the railroad because the exemption is revocable at any time if such action is required to carry out the 15 enumerated national rail policy goals. 49 U.S.C. § 10505(d) (1982).  As set forth in the Staggers Act, this policy includes 'encourage[ment of] fair wages and safe and suitable working conditions.' Id. § 10101a(12).  Thus, in addition to the other numerous pieces of legislation governing labor relations in the railroad industry, see, e.g., Railway Labor Act, 45 U.S.C. § 151 et seq. (1982); Hours of Service Act, 45 U.S.C. § 61 et seq. (1982), the ICC is empowered to cancel the ICA exemption if it adversely impinges upon Metro-North employees. See H.R. Cong. Rep. No. 1430, 96th Cong., 2d Sess. 105, reprinted in 1980 U.S. Code Cong. & Admin. News 4110, 4137." Farley, 865 F.2d at 36–37.

§§ 10101–16106); see also 49 U.S.C. § 10501(a)(1).  The purpose of the ICCTA was to "build[]

on the deregulatory policies that … promoted growth and stability in the surface transportation

sector."  H.R. Rep. No. 104–311, at 93 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 805.  As for

rail transportation, the ICCTA sought to implement a "[f]ederal scheme of minimal regulation for

this intrinsically interstate form of transportation," and to retain only regulations "that are

necessary to maintain a 'safety net' or 'backstop' of remedies to address problems of rates, access

to facilities, and industry restructuring."  Id. at 93, 96, reprinted in 1995 U.S.C.C.A.N. at 805, 808;

see also 49 U.S.C. § 10101(2).

The ICCTA, in relevant part, altered Congress's jurisdiction over rail carriers.  Today, the

STB has broad jurisdiction over "transportation by rail carrier" that is "only by railroad" or "by

railroad and water."  49 U.S.C. § 10501(a)(1)(A–B).  But Congress defined the STB's general

authority to explicitly exclude jurisdiction over "public transportation provided by a local

government[al] authority," with certain limited exceptions.  49 U.S.C. § 10501(c)(2)(A).

Despite this general exclusion, the STB has jurisdiction over the use of terminal facilities[16]

and the switch connections and tracks[17] of a local governmental authority but only if "the Board

finds that such governmental authority meets all of the standards and requirements for being a rail

carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission

that were in effect immediately before January 1, 1996."  49 U.S.C. § 10501(c)(3)(B).  Defendants

suggest the STB may exercise jurisdiction over "public transportation provided by a local

government[al] authority" in other ways, too.  49 U.S.C. § 10501(c)(2)(A).  For example,

Defendants cite the General Accounting Office's Report ("Report") to highlight that STB officials

---

[16]     Under 49 U.S.C. § 11102.

[17]     Under 49 U.S.C. § 11103.

20

have said the Board can extend its jurisdiction to commuter rails if "the local government[al] authority providing the commuter rail services meets the definition of a rail carrier." (Defs.' Resp. at 11–12, ECF No. 69 (citing Ex. G, at 30, ECF No. 54-7).)  Indeed, there may also be other potential statutory hooks for the STB to exercise jurisdiction over certain aspects of a local governmental authority's operations that neither party explicitly address in their motion to dismiss or objection papers.

### 2.    Analysis

To determine whether Defendants are exempt rail carriers under the FLSA, the Court must answer two threshold questions.  First, does the STB have jurisdiction, in some fashion, over Defendants under the ICCTA.  Second, if the STB currently has jurisdiction over Defendants in some fashion, is that jurisdiction sufficient to render Defendants "subject to [the ICCTA]" and therefore exempt from the FLSA's maximum hour requirements under 29 U.S.C. § 213(b)(2). With respect to the latter question, Plaintiffs maintain that if the STB has jurisdiction over very limited and discrete aspects of Defendants' operations, such jurisdiction is insufficient to establish that Defendants are "subject to [the ICCTA]."  29 U.S.C. § 213(b)(2).

The R&R essentially answered both questions in the affirmative, reasoning <u>Farley</u> still controlled this case despite the ICCTA's passage.  The Court disagrees with the R&R's analysis on that score.

As explained below, the Court finds that Defendants have failed to establish, in the specific procedural posture of this case, that they were "subject to [the ICCTA]" and therefore exempt from the FLSA's maximum hour provisions during the relevant time period at issue.  Given that conclusion, the Court cannot answer the second question—namely, whether STB jurisdiction over Defendants' operations under the ICCTA is so limited that the FLSA's rail carrier exemption is

not triggered—on this motion to dismiss.[18]

  a.  *Farley Does Not Control this Case.*

  Although the R&R acknowledged the ICCTA's 1995 amendments to the ICA, it concluded that <u>Farley</u> still controls this case.  (R&R at 22, 27, ECF No. 67.)  To support the continued applicability of <u>Farley</u>, the R&R reasoned that the FLSA's current rail carrier exemption "functionally mirrors" the pre-amendment law that the Second Circuit applied in <u>Farley</u>.  (See <u>id.</u> at 27.)  The R&R believes that to be true because "the STB may revoke a jurisdictional exemption 'at any time,'" just like § 10505 allowed the ICC to administratively exclude otherwise covered rail carriers from regulation.  (See <u>id.</u> comparing <u>Farley</u>, 690 F. Supp. at 272  ("[T]he ICC can partially or completely revoke Metro–North's exemption <u>at any time</u> it finds it necessary to carry out railway policy. . .") (emphasis in original), <u>with</u> 49 U.S.C. § 10502(d) ("The Board <u>may revoke an exemption, to the extent it specifies,</u> when it finds that application in whole or in part of a provision of this part to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title.") (emphasis in original).)

  That comparison is appealing at first glance.  But it is ultimately inapt.  Section 10502 describes <u>agency</u> exemptions that the STB can grant or revoke in a matter related to a rail carrier subject to its jurisdiction.[19]  <u>See</u> 49 U.S.C. § 10502.  Section 10502's agency exemption, however, is different from general <u>statutory</u> exceptions from coverage that are explicitly defined in the

---

[18] The current version of the FLSA provides that the maximum hour provisions of 29 U.S.C. § 207 "shall not apply with respect to … any employee of an employer engaged in the operation of a rail carrier <u>subject to part A of subtitle IV of title 49</u>."  29 U.S.C. § 213(b)(2) (2018) (emphasis added).  The plain language of 29 U.S.C. § 213(b)(2) appears to indicate that the FLSA rail carrier exemption applies if any aspect of a defendant's operation of a rail carrier is subject to STB's jurisdiction under the ICCTA.  Defendants may make this statutory interpretation argument on a motion for summary judgment.

[19] To be sure, the agency exemptions permitted by Section 10502 of the ICCTA are analogous to the agency exemptions at issue in <u>Farley</u> that existed under the ICC.  But because there is no agency exemption issue in this case, the STB's ability to revoke one is irrelevant.

ICCTA.  For example, Section 10502 does not grant STB the authority to revoke a <u>statutory</u> exception to its jurisdiction that is prescribed by Congress.[20]  <u>See</u> 49 U.S.C. § 10502.  Considering the ICCTA's amendments to the ICA, the Court concludes that <u>Farley</u> does not control this case.

      b.  *Defendants Cannot Establish That They are Currently Subject to STB Jurisdiction on This Record.*

Plaintiffs contend that the FLSA's current rail carrier exemption only covers a rail carrier that is subject to the STB's jurisdiction under the ICCTA, and Defendants cannot carry their burden of showing that they are subject to the STB's jurisdiction on this record.  (<u>See</u> R&R at 26, ECF No. 67; <u>see also</u> Pls.' Obj. at 11–14, ECF No. 68.)  Defendants disagree.  At points in their response to Plaintiffs' objections, Defendants argue they are exempt from the FLSA's coverage because the STB has "exercised jurisdiction over the MTA multiple times since the passage of the ICCTA." (Defs.' Resp. at 10, ECF No. 69.)  To support their conclusion, Defendants cite three STB decisions and a New York Appellate Division, Second Department decision.[21]  (<u>See</u> <u>id.</u>)  But upon close examination, each cited decision leaves this Court to speculate and to guess at: (1) <u>how</u> the STB asserted jurisdiction over the local governmental authority in question; (2) <u>when</u> the STB's assertion of jurisdiction occurred; or (3) <u>whether</u> the STB still exercises such jurisdiction. Accordingly, in the Court's view, Defendants have not carried their burden of showing they are subject to the STB's jurisdiction at all relevant periods.

---

[20]     For example, Congress did not—as a statutory matter—grant the STB power to revoke the transportation provided by a local governmental authority prohibition in the ICCTA.  <u>See</u> 49 U.S.C. § 10501(c)(2)(A).

[21]     <u>See Long Island Rail Road Company—Discontinuance of Service Exemption—in Garden City, Long Island, NY</u>, 2002 WL 1271901 (S.T.B. June 5, 2002); <u>see also Long Island Rail Road Company—Discontinuance of Service Exemption—in Garden City, Long Island, NY</u>, 2002 WL 31002773 (S.T.B. Sept. 6, 2002); <u>Metro-North Commuter Railroad Company—Exemption—from 49 U.S.C. Subtitle IV</u>, 2023 WL 8118269 (S.T.B. Nov. 21, 2023); <u>Astro Ready Mix, LLC, et al. v. MTA Long Island R.R.</u>, 192 N.Y.S.3d 131 (2d Dep't 2023).

(1) STB and Court Decisions

Nothing in Defendants' submission cures that deficiency.

First, Defendants cite two STB decisions where the Board granted the LIRR an exemption under 49 U.S.C. § 10502 to discontinue service over the same portion of MTA-owned railroad track in Garden City, New York.[22]  (See Defs.' Exs. E, F, ECF Nos. 54-5, 54-6.)  Neither decision, however, discusses the statutory basis under which the STB originally asserted jurisdiction over the LIRR.  See Long Island Rail Road Company—Discontinuance of Service Exemption—in Garden City, Long Island, NY, 2002 WL 1271901 (S.T.B. June 5, 2002); see also Long Island Rail Road Company—Discontinuance of Service Exemption—in Garden City, Long Island, NY, 2002 WL 31002773 (S.T.B. Sept. 6, 2002).  For example, the STB cited neither 49 U.S.C. § 10501(c)(3)(B) nor any other ICCTA jurisdictional provision.[23]  Moreover, these twenty-two year-old STB decisions do not establish, on their own, that the LIRR is currently subject to the Board's jurisdiction.  These decisions speak to—at best—the state of affairs in 2002, and Defendants provide no evidence whatsoever that the LIRR is currently subject to the STB's jurisdiction in 2024.  Accordingly, Defendants cannot carry their burden of proving they are exempt under the FLSA by relying on these two LIRR STB decisions.  See Martin, 949 F.2d at 614; see also Corning Glass Works, 417 U.S. at 196–97.

Second, Defendants cite a recent STB decision where the Board partially revoked a

---

[22]     These were the only STB decisions cited in the motion to dismiss briefing.  (See Defs.' Exs. E, F, ECF Nos. 54-5, 54-6.)

[23]     Even assuming for the sake of argument that the STB did, at some point, extend its jurisdiction over the LIRR under 49 U.S.C. § 10501(c)(3)(B), the STB decisions cited by Defendants include no finding by STB—as required by 49 U.S.C. § 10501(c)(3)(B)—that the LIRR met "all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996."

Subtitle IV exemption that Metro-North received in 1995.[24]   (See Defs.' Ex. B, ECF No. 69-2.)

There too, STB did not discuss the statutory basis under which it originally asserted jurisdiction

over Metro-North Railroad.  For example, the STB cited neither 49 U.S.C. § 10501(c)(3)(B) nor

any other ICCTA jurisdictional provision.[25]  To the extent STB has allegedly exercised jurisdiction

over Metro-North since 1995, Defendants' failure to raise this argument before the R&R issued is

inexcusable.  Indeed, the decision appears to involve tracks that Metro-North has owned since

1995, so Defendants had ample opportunity to advise the Court of STB's alleged jurisdiction over

these Metro-North tracks before the Board's November 21, 2023, decision.  See Metro-North

Commuter Railroad Company—Exemption—from 49 U.S.C. Subtitle IV, 2023 WL 8118269

(S.T.B. Nov. 21, 2023).  Moreover, Defendants' decision not to advise the Court of the STB's

November 21, 2023, decision cannot be allayed by the fact that their motion to dismiss was deemed

fully briefed as of March 2, 2023.  Indeed, months after their motion to dismiss was fully briefed,

Defendants advised this Court of the New York Appellate Division, Second Department's

intervening decision in Astro Ready Mix, LLC, et al. v. MTA Long Island R.R., 192 N.Y.S.3d 131

(2d Dep't 2023).  (ECF No. 58.)  Defendants easily could have—and should have—provided a

similar update to the Court regarding the STB's November 2023 decision in the Metro-North

matter.  Any attempt by Defendants to characterize their failure to raise the STB decision as

reliance on Farley's continued applicability would be wholly unpersuasive.  Accordingly, the

---

[24]     The Subtitle IV exemption permitted Metro-North to file for abandonment authority and ultimately to pursue interim trail use/railbanking of a rail line under the National Trails System Act (Trails Act), 16 U.S.C. § 1247(d), and 49 C.F.R. § 1152.29.  See Metro-North Commuter Railroad Company—Exemption—from 49 U.S.C. Subtitle IV, 2023 WL 8118269 (S.T.B. Nov. 21, 2023).

[25]     Again, even assuming arguendo that the STB did extend its jurisdiction over Metro-North under 49 U.S.C. § 10501(c)(3)(B) without explicitly saying so, the instant record does not indicate that STB made a finding—as required by the ICCTA—that Metro-North met "all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996."  49 U.S.C. § 10501(c)(3)(B).

Court will not consider the Metro-North STB decision as a part of the objections process on this motion to dismiss.  See Fossil Grp., Inc. v. Angel Seller LLC, 627 F. Supp. 3d 180, 186–87 (E.D.N.Y. 2022) ("[T]he district court 'will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.'") (quoting United States v. Gladden, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019)).

Finally, Defendants cite a decision from the New York Appellate Division, Second Department in which the court determined that plaintiffs' state law negligence claims were preempted by the ICCTA.  (See Defs.' Ex. A, ECF No. 59-1 (citing Astro Ready Mix, LLC, et al. v. MTA Long Island R.R., 192 N.Y.S.3d 131, 132–33 (2d Dep't 2023)).)  There, plaintiffs—business owners who used a side railroad track connected to a main rail line operated by the LIRR—sued for negligence, arguing that they were unable to obtain materials for their business because of delays in work on the LIRR's main line.  See Astro Ready Mix, 192 N.Y.S.3d at 131.  In holding that the plaintiffs' action was preempted by the ICCTA, the Appellate Division noted that the STB has exclusive jurisdiction over "construction, acquisition, operation, abandonment, or discontinuance of . . . side tracks."  Id. (quoting 49 U.S.C. § 10501(b)(2)).  As such, it appears that the Appellate Division concluded that STB had jurisdiction over the private party's track line, which connected to the LIRR's tracks.  At the very least, it is not clear that the decision was premised on a finding that that STB had jurisdiction over the LIRR's tracks.  Even though Astro Ready Mix seems to implicate circumstances in which the STB has some regulatory authority that may impact the LIRR, the Appellate Division's ruling is too vague to draw any definitive conclusions about whether the STB exercised jurisdiction over LIRR (or whether that jurisdiction is sufficient or insufficient to the trigger the FLSA's rail carrier exemption over the Defendants to this case).  Accordingly, the decision does not warrant granting Defendants' motion to dismiss.

Given the foregoing, Defendants have not established that this case implicates one of the circumstances allowing STB to exercise its jurisdiction over the MTA (and by extension, its subsidiaries).  Accordingly, Defendants have not carried their "burden of proving that [their] employees fall within an exempted category of the [FLSA]."  <u>Martin</u>, 949 F.2d at 614 ("[B]ecause the FLSA is a remedial act, its exemptions ... are to be narrowly construed.  Indeed, an employer bears the burden of proving that its employees fall within an exempted category of the Act.") (internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Corning Glass Works</u>, 417 U.S. at 196–97.

(2) General Accounting Office's Report

In passing, Defendants also cite the General Accounting Office's Report ("Report") to highlight that STB officials have said the Board can extend its jurisdiction to commuter rails if "the local government[al] authority providing the commuter rail services meets the definition of a rail carrier."[26]  (Defs.' Resp. at 11–12, ECF No. 69 (citing Ex. G, at 30, ECF No. 54-7).)  While that may be, nothing in the Report addresses whether these Defendants are "rail carriers" within the meaning of the FLSA as amended by the ICCTA.  (<u>See</u> Ex. G, at 30, ECF No. 54-7.)  Accordingly, Defendants cannot carry their burden of proving they are exempt under the FLSA by relying on the Report.  <u>See</u> <u>Martin</u>, 949 F.2d at 614; <u>see</u> <u>also</u> <u>Corning Glass Works</u>, 417 U.S. at 196–97.

*       *       *

For all the above reasons, this Court respectfully overrules the R&R's recommendation to dismiss the Railroad Worker Plaintiffs' FLSA claims.

---

[26]       The Court is aware that STB officials have also said that the Board's jurisdiction may be extended to cover commuter rails in certain circumstances which are irrelevant to this case, such as when a commuter railroad enters a contract with Amtrak, or when or a commuter rail agency acquires control of a railroad and therefore meets the definition of a rail carrier.  (<u>See</u> Defs.' Ex. G, at 30, ECF No. 54-7.)

c.   *Disposition.*

Considering the foregoing, the parties shall engage in expedited fact discovery that is limited to the 29 U.S.C. § 213(b)(2) exemption defense raised by Defendants.  This expedited discovery shall be completed within 60 days of this Order.  At the completion of expedited fact discovery, Defendants may move for partial summary judgment on their 29 U.S.C. § 213(b)(2) exemption defense.

Defendants' motion for partial summary judgment must address the following questions: First, whether (and how) the STB currently exercises jurisdiction over Defendants under the ICCTA.  Defendants shall explain and identify the specific statutory basis (or bases) for STB's alleged jurisdiction over Defendants.  Defendants shall also provide the Court with any relevant administrative and judicial decisions to support their claims, as well as any evidence that may be necessary to establish the STB's alleged jurisdiction over Defendants.  Second, if the STB has jurisdiction over only limited and discrete aspects of Defendants' operations under the ICCTA, Defendants shall explain why they contend they are still "subject to [the ICCTA]" and therefore exempt from the FLSA's maximum hour requirements under 29 U.S.C. § 213(b)(2).  Otherwise put, the parties should address whether STB's limited exercise of jurisdiction over Defendants or their operations is sufficient or insufficient to the trigger the FLSA's rail carrier exemption.

### III.      CONCLUSION

The Court adopts Judge Tiscione's R&R in part and respectfully overrules it in part with respect to Plaintiffs' claims.  Accordingly, Defendants' motion to dismiss Plaintiffs' NYLL overtime wages claims is GRANTED, Defendants' motion to dismiss Plaintiffs' NYLL frequency of pay claims is GRANTED, and Defendants' motion to dismiss the Railroad Worker Plaintiffs' FLSA claims is DENIED.  Upon the completion of the expedited fact discovery described above,

the parties shall file a proposed briefing schedule for Defendants' motion for partial summary judgment on their 29 U.S.C. § 213(b)(2) exemption defense.

**SO ORDERED.**

Dated: September 19, 2024
Central Islip, New York

_____/s/ JMA_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE